ANAHEIM GARDENS, et al., Plaintiffs,

v.

The UNITED STATES, Defendant.

No. 93–655C.

United States Court of Federal Claims.

March 27, 1995.

---

Charles L. Edson, Washington, DC, for plaintiffs. Messrs. Harry J. Kelly, Stephen J. Wallace and Richard M. Price, of counsel.

Richard E. Rice, Washington, DC, with whom were Asst. Atty. Gen. Frank W. Hunger, and David M. Cohen, Director, for defendant. Kathleen Burtschi, Dept. of Housing and Urban Development, of counsel.

## OPINION ON RECONSIDERATION [1]

ROBINSON, Judge:

This case is before the court on defendant's motion to dismiss for lack of subject matter jurisdiction or, in the alternative, for failure to state a claim for which relief can be granted. Oral argument on the motion was held on November 8, 1994. For the reasons set forth below, the court now grants defendant's motion on all counts except plaintiffs' regulatory taking claim, which must be tried.

1. On January 9, 1995, the court issued an Opinion and entered a Judgment dismissing this case. That judgment was vacated by a separate order on March 27, 1995.

## Factual Background

During the 1950s and 1960s, Congress enacted legislation to encourage private developers to construct, own and manage housing projects for low and moderate-income families. To implement the legislation, Congress authorized first the Federal Housing Administration and later the Department of Housing and Urban Development ("HUD" or "the agency")[2] to provide mortgage insurance to enable private lending institutions to provide low-interest mortgages to housing developers.

Housing developers also received financial incentives along with mortgage insurance, under either of two programs. The first, referred to as "Section 221," provided for below-market mortgage rates. Pub.L. 83–560, 68 Stat. 590, 597 (1954), *amended by* Pub.L. 87–70, 75 Stat. 149 (1961). Developers who obtained mortgages after 1968, however, were subject to a new provision enacted that year known as "Section 236." Developers who participated in Section 236 received market-rate mortgages with an interest subsidy. Pub.L. 90–448, 82 Stat. 498, 499 (1968). In either case, developers were expected to pass these financial benefits on to their tenants in the form of lower rents. *Id.*

Typically, when a developer received a HUD-insured mortgage under one of these programs, the developer signed a long-term deed of trust note[3] with a private lender; HUD endorsed the note. The repayment period on the loan was 40 years. Simultaneously, the developer also entered into a "regulatory agreement" with the agency which placed certain conditions on the mortgages. Most importantly, the regulatory agreement imposed restrictions on the income levels of tenants, on the rents that could be charged, and on the rates of return that the developer could receive (collectively, "affordability restrictions"). The regulatory agreement, as well as the mortgage insur-

ance provided by HUD, was to remain in effect as long as the mortgage loan remained outstanding.

Clauses in the HUD-endorsed notes, which were printed on forms approved by the agency, prohibited prepayment of the mortgages before 20 years from the date of endorsement, except under certain conditions which included HUD approval of the prepayment. However, the notes further stated that, after making payments for 20 years, owners could prepay their mortgages in full without prior HUD approval. These provisions made clear that prepayment of the mortgages would effectively terminate the regulatory agreements as well as the affordability restrictions.

By the late 1980s, Congress became concerned that a large number of owners might take advantage of the prepayment clauses within a short period of time, thus drastically reducing the supply of low-income rental housing throughout the country. *See* S.Rep. No. 316, 101st Cong., 2d Sess. 105, *reprinted in* 1990 U.S.Code Cong. & Admin.News 5763, 5867. Congress enacted two pieces of legislation to directly counter the threat of massive prepayments. The first bill, the Emergency Low Income Housing Preservation Act ("ELIHPA") was enacted in 1987. Pub.L. 100–242, 101 Stat. 1877 (reprinted as amended at 12 U.S.C.A. § 1715*l* (note) (West 1989)). It effectively placed a two-year moratorium on prepayments in order to give Congress "breathing room" with which to devise a permanent solution. *Id.* at § 221(b). While it did not prohibit prepayments altogether, ELIHPA did require owners to apply to HUD for permission to prepay. *Id.* at § 222. ELIHPA authorized HUD to approve a prepayment only after making written findings that the prepayment would have minimal effects on the existing tenants, the local low-income housing market in general, and the local housing market for minorities. *Id.* at § 225.[4]

---

**2.** In 1965, the Federal Housing Administration, headed by the Federal Housing Commissioner, was subsumed into the newly established Department of Housing and Urban Development. *See* 24 C.F.R. §§ 200.1–200.4 (1994).

**3.** This opinion, for the sake of convenience, uses the terms "mortgage" and "deed of trust note"

interchangeably, although the court is aware of their distinctions, which are rooted in state law. *See Black's Law Dictionary* at 373 (West 1979).

**4.** The text of § 225(a), which is specifically applicable to prepayment, reads in part as follows:

In 1990, Congress replaced ELIHPA with the Low Income Housing Preservation and Resident Homeownership Act ("LIHPRHA"). In addition to making the moratorium described above permanent, LIHPRHA authorized HUD to provide incentives to owners to maintain the affordability restrictions on their properties.[5] Pub.L. 101–625, 104 Stat. 4249 (1990) (reprinted at 12 U.S.C.A. § 4101 *et seq.*).[6]

Under LIHPRHA, whether a developer wishes to prepay the mortgage or to apply for incentives, the same procedures apply. The process is begun when a property owner files a Notice of Intent ("N.O.I.") with HUD, "in the form and manner" prescribed by the agency, with copies to be sent to state and local housing authorities, mortgagees and tenants. 12 U.S.C. § 4102. The property must then be appraised by two independent appraisers to determine its "preservation value," which in turn becomes a basis for any incentives which are ultimately offered to the owners. 12 U.S.C. § 4103, *see also* §§ 4104(a) and 4110(d). Within nine months after receiving an N.O.I. (or six months if the N.O.I. proposes to terminate affordability restrictions), HUD must send the owner a report containing the results of the appraisals and other information which is necessary for the owner to proceed. 12 U.S.C. § 4106. The owner must then, within six months, file a Plan of Action ("P.O.A.") with HUD indi-

cating whether the owner wishes to prepay the mortgage (terminating the affordability restrictions), extend the affordability restrictions by requesting incentives, or sell the property to a buyer who will agree to maintain the affordability restrictions. 12 U.S.C. § 4107.

HUD must approve or disapprove a P.O.A. within 180 days of filing, provided the P.O.A. is not deficient. 12 U.S.C. § 4115(b). If a P.O.A. requesting incentives is approved after the 180 days have passed, LIHPRHA requires that the incentives be retroactive to 180 days after the filing of the P.O.A. 12 U.S.C. § 4115(c). To ensure the timeliness of HUD's P.O.A. approval process, LIHPRHA allows an owner to seek relief in federal district court if HUD does not approve the P.O.A. within the statutory time limit. *Id.*

In order to put these new incentive programs into effect, LIHPRHA required HUD to publish proposed regulations no later than 90 days after the date LIHPRHA was enacted, November 28, 1990. Interim or final rules were to be issued no later than 45 days after that. Pub.L. 101–625 at § 604(d) (Nov. 28, 1990), *reprinted at* 12 U.S.C.A. § 4101 (note) (West Supp.1994). Based strictly on that schedule, according to plaintiffs, interim or final rules should have been published by

---

The Secretary may approve a plan of action that involves termination of the low income affordability restrictions only upon a written finding that—
(1) implementation of the plan of action will not materially increase economic hardship for current tenants ... or involuntarily displace current tenants (except for good cause) where comparable and affordable housing is not readily available, determined without regard to the availability of Federal housing assistance that would address any such hardship or involuntary displacement; and
(2)(A) the supply of vacant, comparable housing is sufficient to ensure that such prepayment will not materially affect—
(i) the availability of decent, safe and sanitary housing affordable to lower income and very low-income families or persons in the area that the housing could reasonably be expected to serve.
(ii) the ability of lower income and very low-income families or persons to find affordable, decent, safe, and sanitary housing near employment opportunities; or

(iii) the housing opportunities of minorities in the community within which the housing is located....

These limitations on HUD's discretion to approve prepayments have essentially been preserved at 12 U.S.C. § 4108.

5. The incentives authorized by LIHPRHA include authorization to increase ceilings on rents, an increase in the authorized annual rate of return from participating properties, financing of capital improvements, and equity loans, among other things. 12 U.S.C. § 4109.

6. LIHPRHA was passed upon the expiration of ELIHPA. Under § 203(a) of ELIHPA, the prepayment restrictions were to expire two years after its enactment, or February 5, 1990. 12 U.S.C. § 1715*l* (note, § 203(a)). ELIHPA's expiration date was extended three times, the last time until November 30, 1990, or the date of the enactment of LIHPRHA, whichever was earlier. Pub.L. No. 101–494 at § 2. Congress eventually passed LIHPRHA on November 28, 1990.

April 13, 1991. Final rules, however, were not published until nearly a year later, on April 8, 1992. 57 Fed.Reg. 12041. Pursuant to the Administrative Procedure Act, 5 U.S.C. § 553(d), those rules presumably took effect 30 days later on May 8, 1992.

### Contentions of the Parties

The plaintiffs [7] who have brought this action do not challenge the substance of LIH-PRHA.[8] In fact, most plaintiffs have sought to participate in the incentive programs by filing P.O.A.'s agreeing to maintain the affordability restrictions on their properties.[9] The basis of their complaint is the fact that HUD's final rules implementing LIHPRHA were not promulgated until a year after they were supposedly due under Congress's original schedule. Plaintiffs allege that they were injured by the delay because they were only able to file P.O.A.'s seeking incentives once the regulations were in place. Thus, they believe that the incentives to which they would be entitled under approved P.O.A.'s should be retroactive to some earlier date when they would have begun to receive their incentives if HUD had issued regulations in a

7. In addition to Anaheim Gardens (a limited partnership in Lomita, CA), the plaintiffs are: Araspark Associates (a limited partnership in Palo Alto, CA); Stefi and Joseph R. Biafora (Reseda, CA); Cedar Gardens Associates (a partnership in San Francisco, CA); Centennial Park Annex (Reno, NV); Florin I, Ltd. (a limited partnership in Pebble Beach, CA); Florin II, Ltd. (a limited partnership in Pebble Beach, CA); Hillview Townhouses, Ltd. (Grand Rapids, MI); Hillview Townhouses, Inc. (Grand Rapids, MI); Priscilla Lai–Fong Hsi and Peter Hwei–Yang Hsi (d/b/a General Partners of Waipahu Tower, Honolulu, HI); Indian Head Manor Limited Partnership I (Bethesda, MD); Jewel Lake Villa Two (a limited partnership in Honolulu, HI); Denise A. and Earl W. Kellenbeck (d/b/a Victorian Arms Apartments in Grants Pass, OR); Norman M. Kronick and Louis Dulien (d/b/a Halawa View Apartments, a general partnership in Honolulu, HI); Metro West Limited (a limited partnership in Palo Alto, CA); Millwood Associates Limited Partnership (Bethesda, MD); Napa Park Apartments (a limited partnership in Bethesda, MD); Ontario Townhouses (a limited partnership in Bethesda, MD); The Palomar Apartments (a limited partnership in San Diego, CA); Rock Creek Terrace Limited Partnership (Bethesda, MD); Sierra Vista One (a limited partnership in Palo Alto, CA); Silverlake Village (a limited partnership in Richmond, VA); Thetford Properties III, Limited Partnership (Richmond, VA); Thetford Properties IV, Limited Partnership (Richmond, VA); Frances T. and J. Derrick V. Ward (Novato, CA); Washington Plaza Apartments, Ltd. (San Diego, CA); James W.Y. Wong (Honolulu, HI); Janey S. Wong (Honolulu, HI); William H. Zenklusen (San Lorenzo, CA); 185–225 Parkhill Corp. (Staten Island, NY); 620 Su Casa Por Cortez (a general partnership in Palo Alto, CA); 825 San Tomas Apartments (a limited partnership in Palo Alto, CA); 5324 Foothill Apartments (general partnership in Palo Alto, CA).

8. Some of the plaintiffs in this case filed a separate action challenging the constitutionality of ELIHPA's constraints on their prepayment rights in *Thetford Properties IV Ltd. Partnership v. HUD*, 907 F.2d 445 (4th Cir.1990). The United States Court of Appeals for the Fourth Circuit affirmed a district court's order that the case be dismissed for plaintiffs' failure to exhaust administrative remedies, stating, "both the statute and the implementing regulations make clear that, under certain circumstances, HUD has the authority to grant [plaintiffs] the ultimate economic relief that they seek—prepayment and withdrawal from the program." 907 F.2d at 448.

In the present case, as in *Thetford Properties*, defendant has argued that the suit should be dismissed for lack of jurisdiction because the plaintiffs have failed to exhaust their administrative remedies, since HUD still retains limited authority to approve a prepayment, if requested. This case is distinguishable from *Thetford Properties*, however, because plaintiffs here do not wish to prepay their mortgages and withdraw from the Section 221 and Section 236 programs; rather, they wish only to be compensated for HUD's delays in implementing the new legislation. The N.O.I./P.O.A. procedures, which the court in *Thetford Properties* identified as the administrative procedures which must be exhausted if the plaintiffs in that case wished to prepay, are therefore inapplicable in this case since such procedures do not lead to retroactive compensation for HUD's delays. The court has previously held that exhaustion is not required when pursuit of administrative remedies would be futile. *See, e.g., Conant v. United States*, 12 Cl.Ct. 689, 693 (1987). As defendant has failed to identify an administrative avenue by which plaintiffs could obtain compensation for HUD's delays, the court must conclude that exhaustion would be futile in this case.

9. As of November 1, 1994, 36 out of the 39 housing projects involved in this case have received the information required from the Secretary under 12 U.S.C. § 4106 in response to their N.O.I.'s. Of the 36 projects which received information from the Secretary, 24 have filed a P.O.A. as required by 12 U.S.C. § 4107. Of those 24, HUD has approved eight plans.

timely manner.[10]

In addition, plaintiffs have made two separate claims alleging that they have suffered a taking without just compensation in violation of the Fifth Amendment. In the first instance, plaintiffs believe that HUD's delay in implementing the LIHPRHA regulations amounted to a taking because the delay effectively denied them the ability to obtain the financial benefits which LIHPRHA had authorized. According to their interpretation of the legislation and its history, Congress intended the incentive programs to be compensation for the regulatory taking of plaintiffs' right to prepay their mortgages. By delaying implementation of the program, thus, plaintiffs argue that HUD has perpetrated a taking without just compensation, which taking Congress had sought to avoid.

The basis of plaintiffs' second taking claim is that the LIHPRHA legislation itself, by restricting plaintiffs' prepayment rights, effected a regulatory taking of plaintiffs' interests in real property.

With respect to plaintiffs' first claim based on HUD's delays and plaintiffs' alleged injuries due to those delays, defendant argues for dismissal based either on lack of subject matter jurisdiction or failure to state a claim for which relief can be granted because LIHPRHA does not authorize the retroactive payments which plaintiffs seek. Defendant further argues that plaintiffs have misconstrued the legislative history of LIHPRHA and that Congress never intended the incentives to be "just compensation."

As for plaintiffs' first (temporary) taking claim, concerning the effect of HUD's delay in implementing LIHPRHA, defendant argues that HUD's alleged actions or inactions cannot constitute a "taking" of a property right within the meaning of the Fifth Amendment. At best, defendant argues, HUD's delays constitute unlawful actions which sound in tort, thus they fall outside the purview of the Tucker Act.

Finally, defendant argues that plaintiffs' second (regulatory) taking claim should be dismissed as unripe for adjudication. Even if plaintiffs' claim is ripe, however, defendant contends that no compensable taking occurred when Congress passed the mortgage prepayment restrictions contained in LIHPRHA because the prepayment restrictions were a regulatory measure taken to prevent injury to the public. Furthermore, defendant argues that mortgage prepayment is not a cognizable property right and that plaintiffs' regulatory taking claim otherwise fails to meet the appropriate criteria for a regulatory taking as set forth in case law.

## DISCUSSION

### A. Exhaustion of Administrative Remedies.

In support of its jurisdictional argument, defendant relies on *Thetford Properties IV Ltd. Partnership v. HUD*, 907 F.2d 445 (4th Cir.1990), a case which involved some of the plaintiffs in this case. In *Thetford*, the plaintiffs filed suit challenging the constitutionality of ELIHPA's constraints on their prepayment rights. The United States Court of Appeals for the Fourth Circuit affirmed a district court's order that the case be dismissed for plaintiffs' failure to exhaust administrative remedies, stating, "both the statute and the implementing regulations make clear that, under certain circumstances, HUD has the authority to grant [plaintiffs] the ultimate economic relief that they seek— prepayment and withdrawal from the program." 907 F.2d at 448.

■ In the present case, as in *Thetford*, the government argues that the suit should be dismissed for lack of jurisdiction because the plaintiffs have failed to exhaust their administrative remedies, since HUD still retains limited authority to approve a prepayment, if requested. This case is distinguishable from *Thetford*, however, to the extent that the plaintiffs here do not wish to prepay

---

**10.** In their first amended complaint, at paragraphs 30–34, plaintiffs complain of several alleged delays by HUD in processing their applications for incentives, apparently in violation of the deadlines established by LIHPRHA. At oral argument, however, plaintiffs' counsel dropped these contentions, saying, "[t]he processing is going pretty well. HUD has its act in order by and large, and they are meeting the six-month schedule or coming close. And that is not what we are here to complain about." Transcript ("Tr.") at 31.

their mortgages and withdraw from the Section 221 and Section 236 programs but wish instead to be compensated for HUD's delays in implementing the new legislation. The N.O.I./P.O.A. procedures, which the court in *Thetford* identified as the administrative procedures which must be exhausted if the plaintiffs in that case wished to prepay, are therefore inapplicable here because such procedures do not lead to retroactive compensation for HUD's delays. The court has previously held that exhaustion is not required when pursuit of administrative remedies would be futile. *See, e.g., Conant v. United States,* 12 Cl.Ct. 689, 693 (1987). As defendant has failed to identify an administrative avenue by which plaintiffs could obtain compensation for HUD's delays, the court must conclude that exhaustion would be futile with respect to plaintiffs statutory claim and plaintiffs' first taking claim (the "temporary taking claim" discussed below).

■ With regard to plaintiffs' regulatory taking claim, the question of whether administrative exhaustion should be required is less clear. Defendant appears to be correct in arguing that HUD retains limited authority under LIHPRHA to approve a prepayment proposal. *See* 12 U.S.C. §§ 4108 and 4114. In *Cienega Gardens v. United States,* 33 Fed.Cl. 196 (1995), this court considered this same question with respect to similarly situated plaintiffs and concluded that a property owner's taking claim based on the EL-IHPA/LIHPRHA prepayment restrictions may not be ripe as long as there is a realistic possibility that HUD might approve a particular owner's prepayment plan and as long as HUD has not yet approved or disapproved such a plan. The court decided, however, that the factual record before the court was inadequate for the purpose of determining ripeness and set that matter for trial. There is no reason the court should reach a different conclusion with respect to the plaintiffs in the present action. Accordingly, trial is necessary to determine whether plaintiffs' regulatory taking claim is ripe.

### B. *Statutory Claim.*

The Tucker Act provides jurisdiction in this court for non-tort monetary claims against the United States, founded either upon the Constitution, a statute, a regulation, or an express or implied contract right against the United States. 28 U.S.C. § 1491. For a complaint to meet this standard, plaintiffs "must find a substantive right in the Constitution, an act of Congress or an executive department regulation on which to base" their claim. *Dehne v. United States,* 970 F.2d 890, 893 (Fed.Cir.1992) (citations omitted).

■ The Tucker Act is a jurisdictional statute; it does not create substantive rights which are enforceable against the United States for money damages. *United States v. Testan,* 424 U.S. 392, 398, 96 S.Ct. 948, 953, 47 L.Ed.2d 114 (1976). The Tucker Act grants jurisdiction only when an independent substantive right for money damages exists. Thus, in the present case, plaintiffs must show that the statute upon which their cause of action is based creates a substantive right, either affirmatively or by a breach of the statute, to payment of monetary damages from the United States.

■ As this court's predecessor stated in *Mitchell v. United States,* a money-mandating statute, regulation or order does not have to expressly provide for relief in this court in order for a plaintiff to bring suit under the Tucker Act. 229 Ct.Cl. 1, 4, 664 F.2d 265, 268 (1981). "Classic instances of legislation directing compensation, and therefore grounding suit in this court, are the statutes providing for military and civilian pay and allowances (which have not, of course, themselves mentioned suit or the right to sue)." *Id.* (Footnote omitted.)

■ As discussed earlier, the injury which plaintiffs allege they have suffered is based on a violation of LIHPRHA § 604(d), by which Congress set a timetable for HUD to first propose and then promulgate final rules to implement the incentive programs authorized by the legislation. Because HUD failed to comply with the statutory timetable, plaintiffs argue, property owners were involuntarily delayed in exercising their right to seek the incentives authorized by LIHPRHA. Defendant does not deny that HUD,

in writing regulations to implement LIH-PRHA, failed to comply with the statutory timetable; instead, defendant argues, LIH-PRHA does not provide for, nor did Congress intend to establish, a remedy for HUD's failure to act strictly in accordance with the schedule in § 604(d). Defendant points out that the sole provision of LIH-PRHA which makes explicit reference to judicial review of a HUD action is 12 U.S.C. § 4115(c), which establishes a cause of action in the district court to review HUD's failure to process a P.O.A. in a timely manner or to approve a P.O.A. containing no deficiencies.[11]

Section 4115, at subsection (b), sets a time limit of 180 days for HUD to approve a non-deficient P.O.A. Any incentives or assistance offered pursuant to an approved P.O.A. are retroactive to 180 days after filing whenever HUD's approval is delayed past that time. *Id.* at (c). But the statute makes no provision for retroactivity in connection with the rulemaking timetables set forth at LIH-PRHA § 604(d). If plaintiffs are correct in arguing that Congress intended to create a liability on the part of HUD for failing to issue regulations *according* to the § 604(d) timetable, that liability is not expressed in the statute. If such a liability exists, it must be inferred.

Plaintiffs have not identified any precedent in which private parties have been awarded money damages under the Tucker Act based upon a holding that a federal agency had failed to implement a money-mandating act of Congress in a timely manner. Plaintiffs rely primarily on *Mitchell,* which they believe is sufficiently analogous to the present case. In *Mitchell,* the plaintiffs were a group of Indian tribes who filed suit alleging that the government had breached fiduciary duties in its unprofitable management of Indian-owned lands. 229 Ct.Cl. at 2, 664 F.2d at 265. In holding for the plaintiffs, the court surveyed various federal statutes which established a

fiduciary relationship between the Indian tribes, who owned the lands at issue, and the Department of the Interior ("Interior"), which had been directed by those statutes to manage and control the lands for the financial benefit of the tribes. For example, in analyzing one such statute, 25 U.S.C. § 466, in light of the Tucker Act's money-mandating principle, the court concluded that Interior had been given fiduciary responsibilities for which "pecuniary remedies are commonly available in our general law." Without such a remedy, the court said, "the Indians could lose substantial elements of their own property without anything to deter the federal officials ... from violating the governing directives, and without any compensation for that past loss." 229 Ct.Cl. at 11–12, 664 F.2d at 272.

As plaintiffs correctly point out, the United States Court of Claims in *Mitchell* established that Congress had, through several statutes entrusting the Indians' property to Interior, created a cause of action by implication. The cause of action was implied because Congress imposed upon Interior such duties with respect to the Indians' property that a breach of those duties could be remedied only by compensatory damages—hence the applicability of the Tucker Act. *Id.* Plaintiffs, however, have failed to articulate why they believe the present case is analogous to *Mitchell* in any way beyond the mere fact that the plaintiffs in both cases premise their claims on implied causes of action.

Although defendant has not briefed the court on the applicability of *Mitchell* to the present case, the court nonetheless finds the two cases to be factually distinguishable in important ways. In *Mitchell,* the statutes at issue had effectively created a form of trust arrangement, under which Interior was given a trustee-like power to control and manage lands for the sole purpose of providing reve-

---

11. In their briefs, the parties disagree as to whether the judicial review available under § 4115 may be sought in this court. Defendant argues that the relevant portion of § 4115, "An owner may bring an action in the appropriate Federal district court to enforce this subsection," establishes an exclusive district court action, precluding jurisdiction in this court. Plaintiffs argue, in response, that the use of the word "may"

indicates a permissive district court remedy which does not preclude a § 4115 action from being brought in this court. However, because plaintiffs in the present action do not seek a review of an adverse or untimely determination by HUD with respect to a P.O.A., it is not necessary for the court, in this action, to resolve the controversy as to the exclusivity of § 4115's district court remedy.

nue for the owners of those lands, the Indians; as a result, the court charged Interior with a fiduciary duty to the Indians of which there is no analog in the present case. HUD administers the Section 221 and 236 programs only indirectly, in the role of a regulator—not directly, as in the role of a trustee or fiduciary. With statutory guidance, HUD establishes the rules and regulations under which property owners may obtain construction loans, build and maintain their properties, accept tenants, receive rents and distribute profits to shareholders. Unlike the Indian plaintiffs in *Mitchell,* the property owners in the present case are entrepreneurs who manage their own properties; they are not mere beneficiaries of government actions. In the present case, in contrast to the plaintiffs in *Mitchell,* the ultimate beneficiaries of the authorized incentives are not exclusively the property owners but also the *tenants* of those properties. This fact is evident from the ample protections in the statute afforded to tenants who might be threatened by an owner's decision to terminate the affordability restrictions. *See, e.g.,* 12 U.S.C. § 4108(a). After all, it was to preserve the housing for low-income tenants that Congress first set out to provide incentives to owners to maintain the affordability restrictions on their properties through the legislative efforts that resulted in LIHPRHA. *See, e.g.,* S.Rep. 101–316, 101st Cong., 2d Sess., at 106–7, *reprinted at* 1990 U.S.Code Cong. & Admin.News 5868–5869; *see also* House Conf. Rep. 101–943 at 458, *reprinted at* 1990 U.S.Code Cong. & Admin.News 6163.

Furthermore, the nature of the mandate which Congress imposed upon Interior in *Mitchell* was much less ambiguous than the one allegedly imposed upon HUD in this case. In *Mitchell,* the Court of Claims found that Congress, through 25 U.S.C. § 466, had required Interior not merely to manage the Indians' forestland but specifically to manage it "on the principle of sustained yield management ... 'to assure that the Indian forests [would] be permanently productive [and] yield continuous revenue to the tribes.'" 229

Ct.Cl. at 11, 664 at F.2d 272, *quoting* 78 Cong.Rec. 11730 (1934). In the present suit, plaintiffs have identified the major financial incentive available to them under LIHPRHA—the eight percent annual authorized return, 12 U.S.C. § 4104(a) [12]—but they have argued in favor of a retroactive entitlement to it through a significantly less direct process of reasoning. According to plaintiffs, while § 4104(a) establishes the eight percent authorized return, the basis of the eight percent is the "preservation equity." Thus, eight percent return is available only after the property has undergone an appraisal under 12 U.S.C. § 4103 to determine the preservation equity. Although under LIHPRHA § 604(d) the regulations for conducting such audits should have been published by April 1991, they were not in place until May 1992; plaintiffs and other owners thus had to wait about a year longer than they might have expected before beginning the process leading to the receipt of higher returns. To remedy this delay, plaintiffs argue that the court should order HUD to act as if the results of any § 4103 audit were available a year earlier than they actually were.

By seeking such a remedy, plaintiffs are apparently asking the court to infer that Congress intended the incentives under LIHPRHA to be available as soon as regulations implementing the legislation were in effect, regardless of whether HUD was first able to conduct the audits that were supposed to provide the basis for those incentives. A more reasonable interpretation of the statute, however, is that Congress intended the incentives to be available to property owners only after the owners had taken the steps of filing N.O.I.'s and allowing their properties to undergo an independent appraisal process that was intended to be fair both to owners and to the government. Granted, those steps could not be taken by the plaintiffs until HUD had issued rules describing the appropriate procedures, and HUD did not issue those rules until a year after it should have done so under the timetable in § 604(d); the court, however, cannot consequently infer

---

**12.** Prior to the enactment of LIHPRHA, the annual authorized return for the same properties was six percent of the mortgagor's initial equity investment, as determined by HUD. *See* 24

C.F.R. §§ 221.532(a) and 236.50 (1994). That rate of return remains effective under current law until owners have received approval of a P.O.A. filed pursuant to LIHPRHA.

that Congress intended that all potential benefits available under LIHPRHA be retroactive in the event that HUD was late in issuing regulations.

Aside from *Mitchell,* plaintiffs have drawn the court's attention to the legislative history of LIHPRHA to support their position that the legislation is "money-mandating." Plaintiffs believe that Congress established LIHPRHA's incentives to serve as "just compensation" for the statutory abridgement of their contractual right to prepay their mortgages after 20 years. Plaintiffs characterize that abridgement as a "taking" within the meaning of the Fifth Amendment to the Constitution and, accordingly, view the incentives as compensation for that taking.

In support of this theory, plaintiffs point to several statements made by Congressmen and Senators in committee hearings and on the floor of their chambers expressing concern for either ELIHPA's or LIHPRHA's restrictions on prepayment rights. These public statements of legislators, plaintiffs argue, demonstrated that Congress as a body considered the legislation as effectuating a "taking" within the meaning of the Fifth Amendment and intended to provide compensation for that taking. For example, plaintiffs highlight the statement Senator Howell Heflin made on September 27, 1990, which reads in part:

> [T]he very notion of unilaterally abrogating a contract, which has been adhered to by one party for 20 years, flies in the face of the law. I am opposed to it, except in the most extreme circumstances. And when such circumstances arise, that party whose rights are denied must be fully compensated.
>
> \* \* \* \* \* \*
>
> The housing bill which is currently in conference will soon address this issue of compensation. The House-passed version contains a fair, equitable compensation clause

which received broad bipartisan support. If, and only if, it is deemed necessary to abrogate these contracts—and I reiterate my opposition to so doing—I urge adoption of the House-passed prepayment provisions.

136 Cong.Rec. S14091 (daily ed. Sept. 27, 1990).

 To a certain extent, the court can accept plaintiffs' reading of such statements as Senator Heflin's as evidence that at least some members of Congress were concerned that certain rights of property owners were at risk of being taken away by legislation which was under consideration at the time. Furthermore, it is logical to conclude that Congress provided the incentives as a means of making forbearance of prepayment more attractive to owners, while at the same time Congress was making actual prepayment more difficult.[13] However, despite concerns expressed by some members of Congress sympathetic to the rights of property owners such as the plaintiffs in this action, these statements—standing separate from the final legislation which was eventually passed—do not unambiguously reflect the thinking of Congress as a whole as to whether the statute itself was providing compensation for the taking of owners' property rights. As the United States Court of Appeals for the Tenth Circuit said in *Miller v. Commissioner of Internal Revenue,* 836 F.2d 1274, 1283 (1988):

> When there is a conflict between portions of legislative history and the words of a statute, the words of a statute represent the constitutionally approved method of communication, and it would require "unequivocal evidence" of legislative purpose as reflected in the legislative history to override the ordinary meaning of the statute. "Reliance on legislative history in divining the intent of Congress is ... a step to be taken cautiously." *Dept. of Air Force v. Rose,* 425 U.S. 352, 388–89, 96

---

**13.** In addition to the statements of Congressmen and Senators which plaintiffs cite, there are other indications in the legislative record which, though not dispositive, do suggest that some members of Congress viewed the provision of incentives as a form of compensation to the owners for the restrictions imposed on prepay-

ment. *See, e.g.,* S.Rep. 101–316 at 112, *reprinted in* 1990 U.S.Code Cong. & Admin.News at 5874: "[T]he 8 percent return is a fair and reasonable exchange for an owner's agreement to retain the low-income character of the housing for its remaining useful life."

S.Ct. 1592, 1611–12, 48 L.Ed.2d 11 (1976) (Blackmun, J., dissenting).

*See also Piper v. Chris–Craft Indus. Inc.,* 430 U.S. 1, 26, 97 S.Ct. 926, 941–42, 51 L.Ed.2d 124 (1977); *Sharp v. United States,* 27 Fed.Cl. 52, 61 (1992), *aff'd.,* 14 F.3d 583 (1993). Moreover, isolated statements of legislators, whether made in committee hearings or in floor debates, are rarely persuasive when trying to determine the intent of Congress as a whole. *See, e.g., Thompson v. Thompson,* 484 U.S. 174, 191–92, 108 S.Ct. 513, 522–23, 98 L.Ed.2d 512 (1988) (Scalia, J., concurring).

The report issued by the conference committee when final legislation is prepared for House and Senate approval is a somewhat better resource for determining the meaning Congress intended a statute to have. *See Texas State Comm'n for the Blind,* 6 Cl.Ct. 730, 740 (1984). As an expression of congressional intent, of course, conference reports, like the reports issued by the committees which drafted the original bills, remain suspect because they are "crafted by [congressional] staff, not necessarily read by legislators, and are subject to packing via influence of interest groups and other legislative insiders." *Sharp,* 27 Fed.Cl. at 62 (citations omitted). Nonetheless, even if the court reads the portions of the LIHPRHA conference report in the light most favorable to plaintiffs, the court finds no statements therein to support plaintiffs' contention that Congress believed it was "taking" plaintiffs' property rights (in the Fifth Amendment sense) in exchange for the authorized incentives. For example, the conference report states:

> [A] consensus has finally emerged on how best to strike the balance among the interests of owners, the tenants and the communities most affected by the consequences of prepayment. The fundamental principle of [ELIHPA] was that the hous-

ing should be preserved for its intended beneficiaries and that owners should be guaranteed a fair and reasonable return on their investment through new incentives.

House Conf.Rep. 101–943, 101st Cong., 2d Sess., at 458, *reprinted at* 1990 U.S.Code Cong. & Admin.News 6070, 6163.

As defendant correctly argues, the above language suggests not so much that Congress believed it was taking away property rights, but rather that Congress was trying to provide owners with attractive alternatives to exercising prepayment options. The court thus finds no solid foundation in the legislative history for plaintiffs' assertion that Congress clearly intended the incentives to be just compensation for a taking of property in the Fifth Amendment sense.

More importantly, even if plaintiffs are correct in their belief that Congress consciously undertook to provide compensation for what it perceived was a taking of plaintiffs' property rights, the court remains unpersuaded that such an undertaking on Congress's part implicitly gave rise to a liability on HUD's part with respect to LIHPRHA § 604(d), whose timetable remains the statutory basis for plaintiffs' first claim. In *Mitchell,* the court's theory was that the government, by statute, had assumed fiduciary duties with respect to the plaintiffs in that case and that such duties were customarily enforceable with lawsuits for money damages. Since the court has already demonstrated that no fiduciary duties analogous to those in *Mitchell* apply to HUD in the present case, it would remain to be determined whether some other theory of liability could be invoked to require retroactive incentive payments by HUD for its failure to implement the incentive programs within the time limits set forth by Congress. Plaintiffs, regrettably, have not articulated such theory, and the court is likewise unable to do so.[14]

14. Beyond failing to articulate a theory of recovery, plaintiffs' statements identifying the damages they have sustained are also underdeveloped. In their brief in opposition to defendant's second motion to dismiss, at 16, plaintiffs discuss Cedar Gardens Associates, one of the plaintiffs in this case. Under its original deed of trust note, Cedar Gardens was eligible to prepay on April 13, 1991, at which time the regulations implementing LIHPRHA should have been in effect under LIHPRHA § 604(d). After pursuing the incentives in accordance with the regulations that were finally issued in 1992, Cedar Gardens was notified by HUD in early 1994 that its preservation equity was $2,728,985, and its annual authorized return, at eight percent, was $218,319. Because of HUD's year-long delay in writing the regulations, plaintiffs argue that Cedar

Finding no basis in LIHPRHA itself, case law or LIHPRHA's legislative history to support plaintiff's notion that Congress intended HUD to be financially liable to owners for its failure to issue regulations in accordance with the statutory timetable, the court must grant defendant's motion to dismiss this claim for failure to state a claim for which relief can be granted. In doing so, of course, the court expresses no opinion as to whether plaintiffs may pursue an equitable remedy in another forum for the injuries they allegedly sustained due to HUD's delays.

### C. *Temporary Taking Claim.*

Although plaintiffs have described their previous claim for money damages based on HUD's rulemaking delays as "about 97 percent" of their case, Tr. at 23, in their complaint plaintiffs have alternatively characterized HUD's delays as a taking without just compensation in violation of the Fifth Amendment.

Plaintiffs premise their theory that HUD's delayed implementation of LIHPRHA constituted a taking on the notion that Congress intended the incentives authorized by LIHPRHA to be compensation for the taking of plaintiffs' prepayment rights, illustrated by their interpretation of the legislative history discussed earlier. Defendant, as before, disputes the notion that Congress's action with respect to plaintiffs' prepayment rights constituted a Fifth Amendment taking, and both parties have exhaustively briefed the court on the issue of whether LIHPRHA was a taking of plaintiff's contract or property rights.

In prior cases, the court has considered whether administrative foot-dragging can constitute a taking within the meaning of the Fifth Amendment. Courts sometimes refer to such cases as "temporary takings." *See, e.g., Dufau v. United States,* 22 Cl.Ct. 156, 163 (1990), *aff'd,* 940 F.2d 677 (Fed.Cir. 1991); *1902 Atlantic Ltd. v. United States,* 26 Cl.Ct. 575, 581 (1992). Each of these cases acknowledged the United States Supreme Court doctrine that governmental actions which temporarily deny owners the use of their property must be justly compensated under the Fifth and Fourteenth Amendments. *First English Evangelical Lutheran Church v. County of Los Angeles,* 482 U.S. 304, 318, 107 S.Ct. 2378, 2387–88, 96 L.Ed.2d 250 (1987); *see also Agins v. Tiburon,* 447 U.S. 255, 263, n. 9, 100 S.Ct. 2138, 2143, n. 9, 65 L.Ed.2d 106 (1980); *Williamson County Regional Planning Comm'n v. Hamilton Bank of Johnson City,* 473 U.S. 172, 204, 105 S.Ct. 3108, 3125–26, 87 L.Ed.2d 126 (1985).

In order to prevail on a temporary taking claim, a plaintiff must show that substantially all economic use of its property was denied during the period in question.[15] *1902 Atlantic,* 26 Cl.Ct. at 579; *Dufau v. United States,* 22 Cl.Ct. at 163. The court has noted, however, that the Supreme Court has emphasized that although "'extraordinary delays' in the process of government decision-making may give rise to a temporary taking claim ... mere fluctuations in value during the process of government decision-making, absent extraordinary delay, are 'incidents of ownership' ... which cannot be considered as a 'taking' in the constitutional sense." *Dufau,* 22 Cl.Ct. at 163, *quoting*

---

Gardens suffered a "loss" of $218,319. Plaintiffs' figures are dubious, however, because they fail to take into account that, before approval of a P.O.A., Cedar Gardens was receiving an annual authorized rate of return which was lower than eight percent, but greater than zero percent (*i.e.,* six percent of initial equity under 24 C.F.R. §§ 221.532(a) and 236.50). Thus, even if some such theory of recovery had been persuasively advanced, the court would have to deduct such receipts from any damages assessed.

**15.** This result does not appear to be affected by the Federal Circuit's recent opinions holding that, in the context of regulatory takings, plaintiffs may prevail by showing that a regulatory

imposition effected only a partial loss of economically viable use of their property, as opposed to a loss of *all* economically viable use. *See Florida Rock Indus. Inc. v. United States,* 18 F.3d 1560, 1570 (1994) and *Loveladies Harbor, Inc. v. United States,* 28 F.3d 1171, 1180 (1994).

The flexible approach applied by the Federal Circuit in evaluating a loss in value in regulatory takings cases is unnecessary in this instance because plaintiffs have not asserted that HUD's rulemaking delays resulted in a loss of property value—temporary or otherwise. Instead, the losses alleged by plaintiffs are solely the unrealized incentives which they would have been due had HUD issued regulations in a timely manner.

*Agins,* 447 U.S. at 263, n. 9, 100 S.Ct. at 2143, n. 9.

In *Dufau,* the court applied these teachings to a claim that a 16–month delay by the Army Corps of Engineers in processing an application for a permit to fill wetlands amounted to a "temporary taking" which required just compensation. 22 Cl.Ct. at 162–64. Applying *Agins,* however, the court found no basis for holding that the 16–month delay was unreasonable or extraordinary. The court noted, moreover, that during much of the time the permit was allegedly delayed, the parties were actively engaged in negotiations concerning mitigation of the proposed loss of wetlands. *Id.* at 163–64. Furthermore, there was no evidence in the record that the Corps of Engineers had acted in bad faith in processing the application. *Id.* at 164. *Accord Tabb Lakes, Inc. v. United States,* 26 Cl.Ct. 1334, 1353–54 (1992), *aff'd,* 10 F.3d 796 (Fed.Cir.1993). Similarly, in *1902 Atlantic,* the court considered whether a delay by the Corps of Engineers in reviewing another permit application could be viewed as a temporary taking, but the court concluded that "the Government cannot be charged with the delay necessary to complete the review process." 26 Cl.Ct. at 581.

Determining what length of time constitutes an "unreasonable" or "extraordinary" delay involves considerations which are, admittedly, subjective. In a discussion at oral argument concerning the year-long delay between the statutory deadline for issuing regulations and the date when HUD finally issued them, the court asked plaintiffs' counsel what length of time he would have considered reasonable under the circumstances. Counsel offered that "a month or two late [or] three months later" would have been reasonable, but that a year was unreasonable. Tr. at 25. As in the *Dufau* case, however, plaintiffs have made no representations that HUD's rulemaking machinery was not operating during that year to produce the final regulations as expeditiously as possible, nor have plaintiffs represented that any responsible officials at HUD have acted in bad faith. As in *1902 Atlantic,* furthermore, the government cannot be charged with the costs which HUD's delay imposed upon

plaintiffs without some showing by plaintiffs that the delay was not necessary. 26 Cl.Ct. at 581.

Plaintiffs have also failed to represent that they lost substantially all economic use of their properties during the year in question—a showing which is required under *Dufau* and *1902 Atlantic.* In fact, the economic status of plaintiffs' properties remained the same as before LIHPRHA was enacted: plaintiffs continued to own the properties and to receive rents from tenants just as they had done since the properties were built and just as they do now. The "loss" which plaintiffs allegedly sustained was only the delayed ability to earn the higher authorized annual return under 12 U.S.C. § 4104. While such a loss may be quantifiable, it does not constitute a loss of all economic use of the properties because plaintiffs continued to earn revenues from their investments at the same rates they had always enjoyed. Consequently, having failed to establish either that they lost economic use of their property during the year in question or that they incurred losses due to unnecessary delays on HUD's part, plaintiffs have failed to show that they suffered a temporary taking at the hands of HUD.

 Finally, assuming that LIHPRHA's original § 604(d) timetable was mandatory with respect to HUD, the agency's inability to comply with that timetable may be viewed as essentially an illegal act rather than merely an unreasonable or extraordinary act. It is well settled law, however, that illegal acts of government officials cannot, by themselves, give rise to a taking which is adjudicable under the Tucker Act. "Challenges to the propriety of government action sound in tort." *Montego Bay Imports, Ltd. v. United States,* 10 Cl.Ct. 806, 809 (1986); *Shaw v. United States,* 8 Cl.Ct. 796, 799 (1985). The Tucker Act gives this court no jurisdiction over actions which sound in tort. 28 U.S.C. § 1491(a)(1). *See also, e.g., Florida Rock Industries, Inc. v. United States,* 791 F.2d 893, 898 (Fed.Cir. 1986), *cert. den.* 479 U.S. 1053, 107 S.Ct. 926, 93 L.Ed.2d 978 (1987); and *B & F Trawlers, Inc. v. United States,* 27 Fed.Cl. 299, 303 (1992).

Accordingly, the court concludes that plaintiffs have failed to establish that HUD's delay in writing regulations to implement LIHPRHA constituted a taking within the meaning of the Fifth Amendment, and their claim in that regard must be dismissed.

### D. *Regulatory Taking.*

Plaintiffs' final taking claim is based not on HUD's delays, but rather the legislation itself. Plaintiffs claim that LIHPRHA's prepayment restrictions constitute a regulatory taking of private property without just compensation. As discussed earlier, in *Cienega* the court—viewing ELIHPA as well as LIHPRHA—considered whether the prepayment restrictions effected a regulatory taking. The court concluded that before determining whether a compensable regulatory taking occurred it would be necessary to resolve material factual issues concerning ripeness, liability and damages. For the purposes of analyzing the prepayment restrictions as a regulatory taking in the present suit, the position of the instant plaintiffs is identical to that of the plaintiffs in *Cienega*.[16] For that reason, the court must reach the same conclusion as in *Cienega* and set the matter of plaintiffs' regulatory taking claim for trial.

### CONCLUSION

For the foregoing reasons, the court grants defendant's motion for dismissal for failure to state a claim for which this court can grant relief on all counts except plaintiffs' regulatory taking claim.

IT IS SO ORDERED.

---

16. The court's opinion in *Cienega* also addresses defendant's arguments regarding whether mortgage prepayment is a property right and whether prepayment restrictions can be considered an exercise of "police power" designed to prevent injury to the public welfare.