**Don Roger NORMAN, Roger William Norman, and South Meadows Properties Limited Partnership, Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

**No. 95–667L.**

United States Court of Federal Claims.

Aug. 12, 1997.

Roger J. Marzulla, with whom were Laura M. Reifschneider and Evangeline C. Paschal, Washington, DC, for plaintiffs.

Dorothy R. Burakreis, General Litigation Section, Environmental & Natural Resources Division, United States Department of Justice, Washington, DC, for defendant. Michael Wall, United States Department of Justice, Washington, DC, and Lisa Clay, U.S. Army Corps of Engineers, Sacramento, CA, of counsel.

## OPINION

MARGOLIS, Judge.

Plaintiffs, the owners of a 2,425 acre parcel of land in Reno, Nevada, have brought this case seeking damages for an alleged breach of an implied-in-fact contract, and/or just compensation under the Fifth Amendment for an alleged temporary and permanent taking of their property. The case is currently before the Court on plaintiff's motion for partial summary judgment on the issue of liability, and defendant's cross-motion for summary judgment on the entire case. For the reasons set forth below, defendant's cross-motion for summary judgment is granted-in-part and denied-in-part. Plaintiffs' motion for summary judgment on the issue of liability is denied in its entirety.

## FACTS

Plaintiffs in this case are a father and son, Don Roger Norman and Roger William Norman ("Normans"), and a limited partnership, South Meadows Properties Limited Partnership, that was formed to develop commercial and industrial office space on a parcel of land known as the Double Diamond Ranch ("the Ranch") in Reno, Nevada. The Ranch, which is comprised of approximately 2,425 acres of land, was used for ranching and agricultural activities for nearly 80 years. Because the area surrounding the Ranch receives an annual average of only 7.14 inches of natural rainfall, the Ranch was flood irrigated with nearly six acre-feet of water per year per acre, through a complex system of irrigation ditches that criss-crosses the ranch property, in order to support ranching and agricultural activities.

In 1986, the Ranch was purchased by the Southmark Corporation, ("Southmark"), which intended to convert the property from agricultural and ranching use into a large-scale commercial and residential development. Southmark prepared a detailed and comprehensive Master Plan, which called for the construction of 7,000 residential units, 321 acres of commercial space, and 37 acres of retail shops on the former ranch property. The Master Plan also called for the construction of roads, schools, churches, fire stations, recreational trails, parks, etc.—in short, the plan contained all of the elements necessary for the development of a self-contained community.

On January 30, 1987, the Reno City Council conditionally approved Southmark's Master Plan and zoning requests by adopting a resolution of intent approval. However, the City Council's resolution of intent approval contained 41 separate and detailed conditions that Southmark was required to satisfy concerning traffic, transportation, permits, etc. Of particular concern in this case is condition

15, in which the City Council stated that "[p]rior to the issuance of any permit, or the commencement of any site work, [the developer] shall submit plans approved by the [Army] Corps of Engineers delineating wetlands or any other lands the development of which are subject to the issuance of Federal permits."

The Army Corps of Engineers ("the Corps") had previously contacted Southmark in August 1986 concerning the possible existence of wetlands at the Ranch that might be impacted by the proposed Master Plan. At that time, the Corps conducted a preliminary assessment of the Ranch property and concluded that from 50% to 75% of the property—approximately 1300 acres—appeared to contain possible wetland vegetation. Although the Corps' preliminary assessment did not represent a "Final Wetlands Determination," Southmark disagreed with the Corps' conclusion on the grounds that most of the vegetation on the property was present as a direct result of 80 years of artificial flood irrigation. Therefore, on March 16, 1987, Southmark suspended all artificial irrigation of the Ranch in an effort to ensure that the Corps of Engineers could evaluate hydrologic conditions on the Ranch under "normal circumstances" when it did prepare its Final Wetlands Delineation.

Southmark's suspension of artificial irrigation activities continued, without interruption, from 1987 until 1988. In June 1988, a team of wetlands experts from the Corps of Engineers—a delineation team—was sent to the Double Diamond Ranch to conduct the field work needed to prepare a Final Wetlands Delineation. The delineation team visited the Ranch for one week, from June 6 to June 10, 1988, and gathered data from 32 sites throughout the Ranch to determine what portions of the Ranch property, if any, exhibited the three characteristics—(1) hydrology, (2) hydric soil, and (3) hydrophytic vegetation—necessary to classify that land as "jurisdictional wetlands."

Using the field data gathered by the delineation team in June 1988, the Corps issued a report concerning the Double Diamond Ranch property on September 12, 1988. The Corps' 1988 delineation, which was prepared pursuant to the 1987 version of the Corps of Engineers Wetlands Delineation Manual, ("the 1987 manual"), concluded that the Ranch property contained 28 acres of jurisdictional wetlands. The 1988 delineation included a map setting forth the precise location of all 28 acres of jurisdictional wetlands identified by the Corps of Engineers.

Shortly after the Corps of Engineers issued its 1988 delineation, Southmark sold the Ranch property to two entities—Double Diamond Ranch Limited Partnership, ("DDR"), a Nevada limited partnership; and G & E General Contractors, ("G & E"), a Nevada corporation. The sale of the Ranch, for a total purchase price of $20 million, was closed on December 30, 1988. The sale was structured so that DDR took title to approximately 1800 acres of the Ranch which had been designated for residential development ("the Residential portion"), while G & E took title to approximately 470 acres of Ranch land that had been designated for commercial, industrial and retail development ("the Commercial portion"). DDR paid $11.6 million for the Residential property, while G & E paid $8.4 million for the Commercial property.

Following the sale, G & E and DDR entered into an agreement, entitled "Development Agreement," whereby the two entities agreed to work together to develop the Residential and Commercial portions of the Ranch property. The Development Agreement was signed by Robert L. Helms, the president of an entity known as Prime Time Developers, Inc., on behalf of DDR, and by Lance Gilman, president of G & E, on behalf of G & E. Under the agreement, DDR agreed to construct certain offsite improvements such as roads, curbs and gutters, utilities, etc., necessary for the development of the Commercial property. For its part, G & E agreed to ensure satisfaction of the 41 development conditions that had been imposed by the city of Reno in its conditional approval of Southmark's Master Plan. The agreement also addressed the allocation of water rights between the Commercial and Residential development. In addition, both parties agreed "to meet on a regular basis (at least annually)" to discuss traffic mitigation

measures. Finally, the parties acknowledged "that the development of the Commercial Property and the Residential Property will require their continued cooperation and best efforts," and therefore they agreed "to fully cooperate with each other in the development" of the Ranch. Beyond these provisions, the Development Agreement left the parties free to develop their respective portions of the project independently.

Plaintiffs, Don and Roger Norman, acquired the Commercial portion of the Ranch through a tax-free exchange with G & E General Contractors that was consummated on December 30, 1988. However, title to the Commercial property was not transferred from G & E to the Normans until June 20, 1989, when title was transferred to two trusts—the Don Roger Norman Trust and the Roger William Norman Trust. The Normans later quitclaimed their ownership in the 470 acres of Commercial property to plaintiff South Meadows Properties Limited Partnership, a partnership whose limited partners are plaintiffs Don Roger Norman and Roger William Norman, and Lance Gilman. The Normans did not become parties to the 1989 Development Agreement until September 30, 1991, when the Normans and Robert Helms executed a document entitled "Amendment to Development Agreement," which amended the original Development Agreement between DDR and G & E. This amended agreement first recited the fact that G & E had conveyed "all of its obligation, right, title and interest in the [commercial] property . . . and in the [1989] Development Agreement . . ." to the Normans. The amended agreement, like the original Development Agreement between DDR and G & E, called for Helms and the Normans to cooperate in the construction and financing of certain offsite improvements.

In the months following the sale of the Double Diamond Ranch from Southmark to plaintiffs and Robert Helms, a storm of controversy arose concerning the Corps of Engineers' 1988 delineation. The 1988 delineation was severely criticized by the general public, by environmental groups, and even by employees of the Corps of Engineers and other federal agencies, including the Environmental Protection Agency, and the U.S. Fish & Wildlife Service. As a result of this criticism, the Corps informed plaintiffs, by letter dated October 9, 1990, that the 1988 wetlands delineation of the Double Diamond Ranch was "no longer valid," and that a new delineation of the Ranch property was required. The Corps of Engineers' October 9, 1990 letter explained that the 1988 delineation may have been inaccurate because the delineation team utilized a growing season that was not appropriate for Truckee Meadows, the area where the Double Diamond Ranch is located. Therefore, the Corps informed plaintiffs that the Corps would conduct a new delineation, utilizing the proper growing season for Truckee Meadows. In the meantime, the October 1990 letter from the Corps warned that plaintiffs "should not undertake any further activity which results in the discharge of dredged or fill material into areas containing wetland vegetation until a new delineation is completed."

In April 1991, a delineation team from the Army Corps of Engineers returned to the Ranch to collect data for a new wetlands delineation. The delineation team collected data from 108 sites across the property from April 9–12, 1991. The team returned to the Ranch from April 25–26, 1991, to collect data from an additional 18 sites. Using this data, and following the procedures set forth in the 1989 version of the Corps of Engineers Wetlands Delineation manual ("the 1989 manual"), the Corps prepared a new delineation ("the 1991 delineation") of the Double Diamond Ranch. Whereas the 1988 delineation had identified only 28 acres of wetlands, the 1991 delineation identified 230 acres of jurisdictional wetlands on the Ranch property.

On August 17, 1991, before the Corps could forward the results of its 1991 redelineation to plaintiffs, Congress enacted and President George Bush signed Public Law No. 102–104. This legislation specifically provided that, in cases where the Corps of Engineers had begun, but had not yet completed, the process of delineating property pursuant to the 1989 manual at the time the law was enacted,

the landowner or permit applicant shall have the option to elect a new delineation

under the Corps 1987 Wetlands Delineation Manual, or completion of the permit process or enforcement action based on the 1989 Manual delineation, unless the Corps of Engineers determines, after investigation and consultation with other appropriate parties, including the landowner or permit applicant, that the delineation would be substantially the same under either the 1987 or 1989 Manual.

Pub.L. No. 102–104.

The results of the 1991 redelineation were forwarded to plaintiffs in a letter from the Corps of Engineers dated October 9, 1991. In a letter to Robert Junnell of the Corps of Engineers, also dated October 9, 1991, plaintiffs informed the Corps that they did not intend to request a redelineation of the residential portion of the Ranch under the 1987 manual, as they could have requested under Public Law No. 102–104. On October 10, 1991, the Corps of Engineers informed plaintiffs, by letter, that the Corps had determined that the delineation of the Double Diamond Ranch under either the 1987 of 1989 manuals would be substantially the same, and asked plaintiffs for their input. In response, plaintiffs sent a letter to Robert Junnell of the Corps of Engineers on October 30, 1991, in which plaintiffs stated their belief that "a technically competent wetland delineation of the Double Diamond Ranch completed pursuant to either [the 1987 or 1989] manual should result in substantially similar results. For this reason, we will not request a redelineation of the property under the 1987 manual."

The effect of the 1991 delineation on plaintiffs' subsequent efforts to develop the Double Diamond Ranch is the subject of much dispute between the parties. Plaintiffs allege that the Corps of Engineers' rescission of the 1988 delineation, and the Corps' subsequent delay in issuing a Final Wetlands Determination, were fatal to plaintiffs' and Helms' ef-

forts to carry out Southmark's Master Plan for development of the Double Diamond Ranch. Defendant, on the other hand, maintains that the difficulties experienced by the plaintiffs and Helms were caused by plaintiffs' and Helms' own actions. Whatever the cause, it is clear from the evidence presented in the record that the development of the Ranch property did not proceed according to Southmark's original Master Plan.

Shortly after the Corps released the 1991 wetlands delineation, plaintiffs embarked on a plan to develop the 470 acres of Commercial property in phases. In November 1991, plaintiffs applied to the City for a master plan amendment and zoning map amendments to develop a portion of the Commercial property, covering 210 acres, as a Planned Unit Development ("PUD"). According to documents submitted to the City, plaintiffs intended to develop this 210–acre tract—which was referred to in plaintiff's PUD application as "South Meadows Planned Development Phase I"[1]—was to include commercial, industrial, office and multi-family residential components. On February 25, 1992, the City Council tentatively approved plaintiffs' plans to proceed with the development of Phase I of the Commercial property as a PUD.

In late 1994, plaintiffs began to pursue development of the Residential portion of the Double Diamond Ranch, as well as the Commercial portion, as a Planned Unit Development. On September 29, 1994, plaintiff South Meadows Properties purchased the 1802–acre Residential property from the bankruptcy estate of Robert Helms, for a total purchase price of $30 million.[2] In November 1994, plaintiffs filed a petition with the City to reannex the Residential portion of the Ranch. At the same time, plaintiffs sought a master plan amendment and zoning for a PUD for the Residential portion of the Ranch. On January 10, 1995, plaintiffs re-

---

1. According to plaintiffs' PUD application, plaintiffs changed the name of their proposed commercial development to the "South Meadows Planned Development" when they applied for approval of the project as a PUD "to eliminate any confusion that might arise between this project and the Double Diamond residential development that is being undertaken by others."

2. The $30 million purchase price included $2 million cash; plaintiffs' assumption of a $22 million note; and plaintiffs' waiver of a $6 million claim against the Helms bankruptcy estate.

ceived conditional approval from the City to develop the Residential portion of the Ranch as a PUD.

In January 1995, plaintiffs submitted an application to the Corps of Engineers for a permit under section 404 of the Clean Water Act ("section 404 permit"). In their application, plaintiffs sought approval from the Corps to impact 13 acres of wetlands, and 2 acres of other waters of the United States, as part of plaintiffs' plan to develop the entire 2,288–acre Double Diamond Ranch property for commercial, industrial and residential uses. To mitigate the impact of the proposed development on wetlands and other waters, plaintiffs proposed to "create[ ] additional wetlands to ensure no net loss of wetlands functions and values." Plaintiffs' mitigation proposal called for creation of 20.6 acres of replacement wetlands, or approximately 1.37 acres of mitigation for each acre of wetlands impacted. Plaintiffs' application—including the proposed mitigation scheme—was approved by the Corps, and a section 404 permit was issued to plaintiffs on May 22, 1995.

The present suit was initiated on October 5, 1995. In their complaint, plaintiffs allege that the Army Corps of Engineers breached an implied-in-fact contract to produce a wetlands determination for the Double Diamond Ranch property. In addition, plaintiffs allege that the Army Corps of Engineers' repudiation of the 1988 delineation, and the subsequent redelineation of the Ranch property in 1991, resulted in a temporary and a permanent taking of plaintiffs' ability to construct 2,446 homes on the Residential portion of the Ranch property. Finally, plaintiffs allege that the repudiation and redelineation of the Ranch property resulted in a temporary and a permanent taking of 176 acres of the Commercial property.

## DISCUSSION

 Plaintiffs have moved for partial summary judgment solely on the issue of liability, while the government has cross-moved for summary judgment on the entire case. Summary judgment is a "salutary method of disposition designed to secure the just, speedy and inexpensive determination of every action," *Sweats Fashions, Inc. v. Pannill Knitting Co. Inc.*, 833 F.2d 1560, 1562 (Fed.Cir.1987), including actions for just compensation under the Fifth Amendment. *See e.g., Tabb Lakes, Inc. v. United States*, 26 Cl.Ct. 1334, 1357 (1992) (granting defendant's motion for summary judgment in Fifth Amendment taking case), *aff'd*, 10 F.3d 796 (Fed.Cir.1993). This Court may grant summary judgment when there are no genuine issues of material fact, and the moving party is entitled to judgment as a matter of law. RCFC 56; *see Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1390 (Fed.Cir. 1987). Where both parties have moved for summary judgement, as they have in this case, "the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Id.* at 1391.

### I. The Takings Claims

Plaintiffs' first and second claims for relief are claims for just compensation, under the Fifth Amendment, for the government's alleged permanent and temporary takings of their property. Plaintiffs allege that, as a result of the Corps of Engineers' redelineation of the Double Diamond Ranch property, the government has taken two distinct property interests from plaintiffs. First, plaintiffs allege that the government's actions have prevented plaintiffs from erecting 2,446 housing units which plaintiffs were entitled to construct on the Residential portion of the Ranch pursuant to the Master Plan. According to plaintiffs, the value of this lost entitlement is approximately $17 million. Second, plaintiffs allege that the government's actions have prevented plaintiffs from developing approximately 176 acres of land on the Commercial portion of the Ranch property. Plaintiffs claim that this Commercial property had a fair market value of approximately $36 million at the time of the alleged taking.

### A. The Residential Property Claims

 To successfully bring a takings claim, plaintiffs must demonstrate that they possessed a legally-cognizable property interest at the time of the alleged taking. *See United States v. Dow*, 357 U.S. 17, 20, 78

S.Ct. 1039, 1042, 2 L.Ed.2d 1109 (1958) ("[A property owner] can only prevail [on a Fifth Amendment claim] if the 'taking' occurred while he was the owner."); *Eastern Minerals Int'l. Inc. v. United States,* 36 Fed. Cl. 541, 547 (1996) ("Only the owner of property at the time of a taking is entitled to compensation."). In this case, the government argues, plaintiffs did not acquire an interest in the Residential portion of the Double Diamond Ranch until well after the alleged taking had occurred. In particular, the government argues that plaintiffs did not acquire any interest in the Residential property until September 1994, when plaintiffs purchased the Residential property from Robert Helms' bankruptcy estate. By that time, the government points out, the events that constitute the alleged taking in this case—the Corps of Engineers' invalidation of the 1988 wetlands delineation in October 1990, and the Corps' issuance of a new wetlands delineation in October 1991—had already taken place. Thus, defendant argues, plaintiffs did not acquire their ownership interest in the Residential property until *after the alleged taking had occurred,* and as a result, plaintiffs cannot successfully assert a Fifth Amendment claim with respect to this portion of the Ranch property. *See Dow,* 357 U.S. at 20, 78 S.Ct. at 1043; *Eastern Minerals,* 36 Fed. Cl. at 547.

Plaintiffs do not contend that the Normans personally held title to the Residential portion of the Ranch before September 1994. Instead, plaintiffs contend that the Normans possessed a property interest in the Residential property by virtue of their status as "joint venturers" with Robert Helms, the actual record owner of the Residential portion of the Ranch. According to plaintiffs, the Normans and Helms entered into a joint venture on January 4, 1989, when they executed a document entitled "Development Agreement." Plaintiffs argue that, under Nevada law, execution of the Development Agreement evidences the creation of a joint venture between the Normans and Helms because the agreement "specified duties and

obligations for both parties," and provided that "profits were automatically allocated between the Normans and Mr. Helms by dividing the Ranch into the commercial and residential portions and giving each ownership of one of the parcels." Pl.'s Opposition at 36.

After studying the terms of the Development Agreement, this Court concludes that the Agreement did not give plaintiffs a legally-cognizable property interest in the Residential portion of the Ranch. The Development Agreement specifically states that "the parties intend to purchase the [Ranch] property ... in such a fashion that DDR will acquire the residential portion of such property ... and [G & E] will acquire the commercial portion of the property...." Pl.'s Appendix at 87. Regardless of the label that is placed on the Helms–Norman business arrangement, the Court concludes that the clear terms of the Development Agreement plainly indicate the parties' intent to acquire *separate and independent* rights in the Residential and Commercial portions of the Ranch property.

Further evidence that the Commercial and Residential properties were acquired separately can be found in plaintiffs' December 1991 application to the City[3] to develop the Commercial portion of the Ranch as a Planned Unit Development ("PUD"). In particular, plaintiffs' December 1991 application contained the following passage, in which plaintiffs explicitly disavowed any ownership interest in the Residential portion of the Double Diamond Ranch property:

In 1987, the City of Reno annexed the Double Diamond Ranch which included both the present residential development known as the Double Diamond project and the 450–acre commercial/industrial/multifamily development now designated the South Meadows Planned Development. Subsequently, the two portions of the project ... *were bought by separate developers* .... [T]he two projects—across the street from one another—are not only *un-*

---

**3.** Plaintiffs do not dispute that the document cited was filed in connection with plaintiffs' PUD application for the Commercial property. *See* Plaintiff's Response to Defendant's Proposed

Findings of Uncontroverted Fact, filed Nov. 15, 1996, at ¶ 103 ("No dispute regarding the quotations from the documents and the fact that they were filed.").

*der separate ownership* but also under different governmental jurisdictions.

Def.'s Exhibit 82 at 000633 (emphasis added). This representation clearly contradicts plaintiffs' present contention that the Normans somehow acquired an ownership interest in the Residential portion of the Double Diamond Ranch by virtue of their relationship with Helms.

Based on the language of the Development Agreement, as well as plaintiffs' earlier representations to the City disavowing any ownership interest in the Residential property, the Court concludes that plaintiffs did not acquire a property interest in the Residential property by virtue of their relationship with Robert Helms. Indeed, the Court finds that plaintiffs did not acquire an interest in the Residential property until September 1994, when plaintiffs purchased the property from Helms' bankruptcy estate. Because the alleged taking had already occurred by the time plaintiffs acquired their ownership interest in the Residential property, plaintiffs cannot, as a matter of law, assert a Fifth Amendment claim with respect to this land. *See Dow*, 357 U.S. at 20, 78 S.Ct. at 1043; *Eastern Minerals Int'l*, 36 Fed. Cl. at 547. Therefore, defendant is entitled to summary judgment on plaintiffs' claim that the government has taken plaintiffs' interest in the Residential property.

### B. The Commercial Property Claims

■ It is well settled that, "while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking." *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 415, 43 S.Ct. 158, 160, 67 L.Ed. 322 (1922); *see also Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1014, 112 S.Ct. 2886, 2892, 120 L.Ed.2d 798 (1992) (quoting *Mahon*). Over the years, courts have come to recognize two distinct categories of regulatory takings—temporary takings and permanent takings. *See, e.g., First English Evangelical Lutheran Church v. County of Los Angeles*, 482 U.S. 304, 318, 107 S.Ct. 2378, 2387, 96 L.Ed.2d 250 (1987) (temporary taking); *Lucas*, 505 U.S. at 1015–16, 112 S.Ct. at 2893–94 (permanent taking). The Supreme Court has made clear, however, that both categories of taking require

compensation under the Fifth Amendment. *See First English*, 482 U.S. at 318, 107 S.Ct. at 2388 ("'[T]emporary' takings which … deny a landowner all use of his property, are not different in kind from permanent takings, for which the Constitution clearly requires payment.").

Plaintiffs in this case are seeking compensation for both a permanent and a temporary taking of their Commercial property. In their first claim for relief, plaintiffs allege that the government has permanently taken 176 acres of plaintiffs' property by forcing plaintiffs to "set aside 176 acres of commercial property for preservation as 'wetland.'" In their second claim for relief, plaintiffs allege that the government effected a temporary taking of plaintiffs' Commercial property by "preclud[ing] all development of the Double Diamond Ranch for more than six years" while the Corps of Engineers "reconsidered, revoked, redelineated and thoroughly repudiated the 1988 Final Wetlands Determination."

#### 1. Permanent Taking Claim

■ A property owner whose land is affected by government regulation may prove that the government's actions have gone "too far," resulting in a compensable taking of property, under one of two tests. First, a property owner may show that the government has effected a "categorical taking" by demonstrating that the regulation has denied the property owner of "all economically beneficial or productive use of land." *Lucas*, 505 U.S. at 1015, 112 S.Ct. at 2893. As the Court of Appeals for the Federal Circuit explained in *Florida Rock Indus., Inc. v. United States*, "[i]f a regulation categorically prohibits *all* economically beneficial use of land— destroying its economic value for private ownership—the regulation has an effect equivalent to a permanent physical occupation. There is, without more, a compensable taking." 18 F.3d 1560, 1564–65 (Fed.Cir. 1994), *cert. denied*, 513 U.S. 1109, 115 S.Ct. 898, 130 L.Ed.2d 783 (1995).

■ Even if a property owner is unable to prove that the government has effected a categorical taking, *i.e.*, if the government has not denied the property owner of *all* econom-

ically viable use of the property, the property owner may nevertheless be able to prove that the government has effected a compensable "partial taking." *Florida Rock*, 18 F.3d at 1570. In those cases where the property owner alleges a partial taking of property, the court must conduct an ad hoc factual inquiry into the circumstances of each particular case, balancing the following three factors that have particular significance: "(1) 'the economic impact of the regulation on the claimant'; (2) 'the extent to which the regulation has interfered with distinct investment-backed expectations'; and (3) 'the character of the governmental action.'" *Connolly v. Pension Benefit Guaranty Corp.*, 475 U.S. 211, 225, 106 S.Ct. 1018, 1025, 89 L.Ed.2d 166 (1986) (quoting *Penn Central Transp. Co. v. New York City*, 438 U.S. 104, 124, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631 (1978)).

█ The critical factor in determining whether the government has effected a taking of property, under either the categorical or the ad hoc test, is the relationship between the value of the property interest that was allegedly taken and the value of the property owner's interest in the "parcel as a whole." *Penn Central*, 438 U.S. at 130–31, 98 S.Ct. at 2662; *see also Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 497, 107 S.Ct. 1232, 1248, 94 L.Ed.2d 472 (1987) ("[O]ur test for regulatory taking requires us to compare the value that has been taken from the property with the value that remains in the property . . . ."). As the Court of Appeals for the Federal Circuit has recognized, determining what constitutes the "parcel as a whole" is not only critical to takings analysis, it is often difficult to determine:

> [T]he question of whether there has been a partial or total loss of economic use ( [in the former case a "partial" taking, and] in the latter case a "categorical" taking), depends on what is the specific property that was affected by the permit denial. If the tract of land that is the measure of the economic value after the regulatory imposition is defined as only that land for which the use permit is denied, that provides the easiest case for those arguing that a categorical taking occurred. On the other hand, if the tract of land is defined as some

larger piece, one with substantial residuary value independent of the wetlands regulation, then either a partial or no taking occurred, depending on the test as described in *Florida Rock*. This is the denominator problem.

*Loveladies Harbor, Inc. v. United States*, 28 F.3d 1171, 1180 (Fed.Cir.1994) (citations omitted).

█ In this case, the Court finds that there are genuine issues of material fact concerning the value of the property allegedly taken, as well as the value of the property remaining, which preclude the Court from granting summary judgment for either party. For example, the government disputes plaintiffs' contention that plaintiffs have been deprived of all economically viable use of their property, as well as plaintiffs' contention that the cost of constructing mitigation wetlands is prohibitively expensive. Defendant also argues that some of the commercial acreage within plaintiffs' claim was purchased subject to notice of the 1988 delineation; that some acreage is no longer owned by plaintiffs; and that some acreage was not purchased until 1994, subject to notice of the 1991 wetlands delineation. Because these issues are disputed, this Court cannot adequately compare the value of the property allegedly taken with the value of the parcel as a whole. However, as previously noted, this comparison is critical to determining whether plaintiffs have suffered a categorical taking, a partial taking, or no taking of the Commercial property. *Keystone Bituminous Coal*, 480 U.S. at 497, 107 S.Ct. at 1248; *see also Penn Central*, 438 U.S. at 130–31, 98 S.Ct. at 2662; *Loveladies Harbor*, 28 F.3d at 1180. Therefore, this Court must deny both parties' motions for summary judgment on the issue of whether plaintiffs suffered a permanent taking of their Commercial property.

### 2. Temporary Taking Claim

█ In evaluating temporary taking claims, courts generally focus on two elements. First, courts look to determine whether the government's actions have temporarily deprived the property owner of all or substantially all economically viable use of their property. *See, e.g., Anaheim Gardens*

*v. United States,* 33 Fed.Cl. 24, 36 (1995) ("In order to prevail on a temporary taking claim, a plaintiff must show that substantially all economic use of its property was denied during the period in question."); *Tabb Lakes, Inc. v. United States,* 26 Cl.Ct. 1334, 1352–54 (1992) (rejecting temporary takings claim where landowner had "substantial economically beneficial use" of property during period of alleged temporary taking), *aff'd,* 10 F.3d 796 (Fed.Cir.1993); *1902 Atlantic Limited v. United States,* 26 Cl.Ct. 575, 579 (1992) ("Just as in a permanent taking claim, plaintiff must show that substantially all economic use of its property was denied during the time in question."); *Dufau v. United States,* 22 Cl.Ct. 156, 163 (1990) (property owners asserting temporary takings claim "correctly recognize that they must prove substantially all economically viable use of their property has been denied").

Second, in evaluating a property owner's claim of a temporary taking, courts look to determine whether the government is responsible for "extraordinary delay" in the regulatory process. *See, e.g., Anaheim Gardens,* 33 Fed.Cl. at 37 (temporary taking requires showing of "unreasonable" or "extraordinary" delay); *Tabb Lakes,* 26 Cl.Ct. at 1352–54 (rejecting plaintiff's temporary takings claim where plaintiff was unable to demonstrate "extraordinary delay" by the government); *1902 Atlantic Limited,* 26 Cl.Ct. at 581 ("[T]he only way plaintiff can recover [for a temporary taking] is to prove that this period constituted extraordinary delay."); *Dufau,* 22 Cl.Ct. at 163 ("The Supreme Court has suggested that 'extraordinary delays' in the process of government decision-making may give rise to a temporary taking claim."). As the Supreme Court explained, "[m]ere fluctuations in [property] value during the process of governmental decisionmaking, *absent extraordinary delay,* are 'incidents of ownership. They cannot be considered a "taking" in the constitutional sense.' " *Agins v. City of Tiburon,* 447 U.S. 255, 263 n. 9, 100 S.Ct. 2138, 2143 n. 9, 65 L.Ed.2d 106 (1980) (emphasis added) (quoting *Danforth v. United States,* 308 U.S. 271, 285, 60 S.Ct. 231, 236, 84 L.Ed. 240 (1939)).

Plaintiffs in this case have offered evidence allegedly showing that the government "precluded all development of the Double Diamond Ranch for more than six years" while the Corps of Engineers "reconsidered, revoked, redelineated and thoroughly repudiated the 1988 Final Wetlands Determination." For example, plaintiffs contend that during the period when the Corps of Engineers' 1988 delineation was being attacked by numerous groups, "Corps representatives ... informed [plaintiffs] orally that they believed that there was significant additional jurisdictional wetland at the Ranch and that the owners should not engage in any construction activity whatsoever before a determination was made as to whether or not the Corps was going to redelineate the property. Accordingly ... construction of the Double Diamond Ranch remained at a standstill." Pl.'s Additional Proposed Findings of Uncontroverted Fact, filed Nov. 15, 1996, at ¶ 34. Plaintiffs also point out that the October 1990 letter from the Corps informing plaintiffs that the 1988 delineation was no longer valid warned that plaintiffs "should not undertake any further activity which results in the discharge of dredged or fill material into areas containing wetland vegetation until a new wetland delineation is completed." Pl.'s Additional Proposed Findings of Uncontroverted Fact at ¶ 35; Pl.'s Exhibit 44. Furthermore, plaintiffs maintain that "[t]he redelineation process consumed another year, during which the Ranch lay completely dormant." Pl.'s Additional Proposed Findings of Uncontroverted Fact at ¶ 37.

Plaintiffs also maintain that the Corps "repeatedly fumbled opportunities to bring the delineation controversy to a conclusion," and thereby caused an unreasonable delay. For example, plaintiffs have offered evidence allegedly showing that all of the federal agencies involved in the delineation controversy agreed that conditions on the Ranch property were ripe to conduct a delineation in April 1990, but that the Corps did not begin to conduct the fieldwork needed to delineate the property until April 1991. In addition, plaintiffs maintain that redelineation was not fully completed until September 1994, when the Corps finally identified additional jurisdictional waters of the United States. Finally,

**428**

plaintiffs point to letters from the Corps of Engineers to Senators Bennett and Craig, in which the Corps acknowledged that the redelineation had taken an "unusual length of time" to complete, "well beyond the norm for the Army Corps of Engineers wetland delineations."

The government disputes plaintiffs' contention that the Corps of Engineers prevented plaintiffs from developing the Commercial property while the Corps considered redelineating the Ranch property. For example, defendant proffers that "from the Corps' standpoint, plaintiffs were free to proceed with construction until the Corps issued its letter in October 1990 rescinding the 1988 delineation." Def.'s Response to Pl.'s Additional Proposed Findings of Uncontroverted Fact at ¶ 34. Defendant also challenges plaintiffs' assertion that the property "lay dormant" until the redelineation was completed on October 1991 by pointing out that plaintiffs received a delineation map in summer 1991, and that development of uplands areas was allowed to proceed during the reconsideration period. Def.'s Response to Pl.'s Additional Proposed Findings of Uncontroverted Fact at ¶ 37.

Defendant also disputes plaintiffs' claim that the government unreasonably delayed the redelineation. Defendant argues that the delays in the redelineation process are attributable to "the size and complexity of the site, the hydrological manipulations that had occurred recently and through time, and the drought conditions in the preceding years." Def.'s Reply at 18–19. In addition, defendant argues that "because there were seasonal wetlands on the site, the time during which wetlands could be accurately delineated was limited to a short period in the spring, early in the growing season." *Id.* at 19. Moreover, defendant argues that the Corps' failure to identify other jurisdictional waters until September 1994 was caused, at least in part, by plaintiffs' own failure to provide the Corps with a map showing the location of "other waters" on the Ranch property.

After examining the contentions of both parties and the supporting evidence contained in the record, the Court concludes that there are genuine issues of material fact with respect to the economic impact of the government's actions on plaintiffs, as well as the reasonableness of the government's actions. Therefore, neither party is entitled to summary judgment at this time on plaintiffs' claim that the government has temporarily taken plaintiffs' Commercial property.

### C. Ripeness of Plaintiffs' Permanent Takings Claims

 Finally, the government argues that plaintiffs' permanent takings claim is not ripe for adjudication because plaintiffs never applied for and were never denied a permit to develop the Commercial property. Defendant relies primarily on *United States v. Riverside Bayview Homes, Inc.,* 474 U.S. 121, 127, 106 S.Ct. 455, 459, 88 L.Ed.2d 419 (1985), where the Supreme Court held that "[o]nly when the permit is denied and the effect of the denial is to prevent 'economically viable' use of the land in question can it be said that a taking has occurred." In this case, defendant argues that plaintiffs' claims are not ripe because plaintiffs have never requested, and thus have never been denied, a Section 404 permit to develop the property at issue.

Plaintiffs respond by arguing that a property owner need not apply for a wetlands permit before pursuing a Fifth Amendment claim if filing a permit application would have been a futile experience. *See Eastern Minerals, Int'l,* 36 Fed. Cl. at 547 ("Plaintiffs are not required to exhaust [permit] procedures [before pursuing a Fifth Amendment claim] if it would be futile to do so."); *City National Bank of Miami v. United States,* 30 Fed. Cl. 715, 720 (1994) (same) (citing *MacDonald, Sommer & Frates v. Yolo County,* 477 U.S. 340, 350 n. 7, 106 S.Ct. 2561, 2567 n. 7, 91 L.Ed.2d 285 (1985)). In this case, plaintiffs argue that the Corps of Engineers "made abundantly clear that it would deny any permit application which did not contain mitigation conditions whose costs would exceed the value of the property released." Pl.'s Opposition at 31. In particular, plaintiffs allege that the Corps made clear that plaintiffs would be required to construct "artificial wetlands," at a ratio of 2:1, as mitigation for the destruction of wetlands on the Ranch proper-

ty. Pl.'s Additional Proposed Findings of Uncontroverted Fact, filed Nov. 15, 1996, at ¶¶ 56–57. Because of the prohibitively high cost of constructing these artificial wetlands as mitigation, *id.,* plaintiffs contend that the act of submitting another permit application would have been futile.

The government disputes plaintiffs' claim of futility. Specifically, the government disputes plaintiffs' contention that the Corps informed plaintiffs that they would be required to construct artificial wetlands at a ratio of 2:1 to replace any wetlands affected by plaintiffs' development of the Commercial property under a § 404 permit. Def. Response to Pl.'s Additional Proposed Findings of Uncontroverted Fact, filed Jan. 3, 1997, at ¶¶ 56–57. According to the government, the Corps did not impose any mitigation measures above those proposed by plaintiffs in their permit application. *Id.* Furthermore, the government argues that plaintiffs' claim that the construction of artificial wetlands would have been prohibitively expensive is entirely speculative. *Id.* After considering the record and the arguments of both parties, the Court concludes that there are disputed issues of fact surrounding the issue of ripeness and/or plaintiffs' claim of futility. Therefore, defendant's ripeness defense must be rejected at this time.

## II. The Contract Claim

Plaintiffs' third claim for relief is based on the Corps of Engineers' alleged breach of an implied-in-fact contract to conduct a wetlands delineation of the Double Diamond Ranch property. Plaintiffs allege that in 1987, the Corps of Engineers entered into a contract with the owners of the Double Diamond Ranch at the time—Double Diamond Ranch, Ltd., and the Southmark Corporation—to conduct a comprehensive delineation of the entire Ranch property, and to issue a Final Wetlands Delineation Report. According to plaintiffs, the government breached this contract when it repudiated the 1988 delineation and redelineated the property according to the 1989 manual. Plaintiffs claim that they have been damaged in an amount equal to the value of the development if it had been allowed to proceed according to the 1988 delineation and master plan.

It is well settled that the elements of an implied-in-fact contract are identical to the elements of an express contract; only the nature of the proof differs. *Russell Corp. v. United States,* 210 Ct.Cl. 596, 609, 537 F.2d 474 (1976), *cert. denied,* 429 U.S. 1073, 97 S.Ct. 811, 50 L.Ed.2d 791 (1977). Thus, to establish the existence of an implied-in-fact contract, plaintiffs must demonstrate (1) an unambiguous offer, (2) an unambiguous acceptance, (3) a mutual intent to be bound, and (4) consideration. *City of El Centro v. United States,* 922 F.2d 816, 820 (Fed.Cir.1990), *cert. denied,* 501 U.S. 1230, 111 S.Ct. 2851, 115 L.Ed.2d 1019 (1991); *see also H.F. Allen Orchards v. United States,* 749 F.2d 1571, 1575 (Fed.Cir.1984), *cert. denied,* 474 U.S. 818, 106 S.Ct. 64, 88 L.Ed.2d 52 (1985). In addition to these basic contract elements, plaintiffs must also establish that the officer whose conduct gave rise to the contract had actual authority to bind the United States. *City of El Centro,* 922 F.2d at 820; *H.F. Allen Orchards,* 749 F.2d at 1575.

The evidence of an agreement offered by plaintiffs is an April 26, 1988 Corps of Engineers' memorandum entitled "Fact Sheet—Double Diamond Ranch (Southmark Corporation) Reno, Nevada." *See* Pl.'s Opposition at 43; Pl.'s Exhibit 9. This document, which was prepared by Art Champ, the Chief of the Corps' Regulatory Section, offered the following summary of the Corps' decision to delineate the Ranch property:

In August 1986, the Corps of Engineers became aware of a proposed residential and commercial development at the Double Diamond Ranch.... [O]ur preliminary determination was that a large portion of [the Ranch] contained wetlands subject to regulation under Section 404 of the Clean Water Act. The city of Reno and Southmark Corporation were informed in August 1986 of this preliminary finding and notified that a comprehensive jurisdictional determination should be conducted. They were also notified that no dredged or fill material could be placed in wetlands without first obtaining a Corps of Engineers permit.

In February 1987, [the Corps] discovered that two ditches had been constructed

through the wetland area and the material had been sidecast into wetlands. This constitutes a violation of Section 404 since no permit had been obtained. In addition, no wetland determination had been conducted prior to this time. After several months of discussions and negotiations, the Southmark Corporation agreed to resolve the violation by refilling the ditches with the sidecast material. In addition, Southmark agreed to a comprehensive wetland survey to be conducted by the Corps of Engineers in the spring of 1988.

Pl.'s Exhibit 9.

██ This April 26, 1988 memorandum does not support the existence of an implied-in-fact contract. Quite the contrary, the April 1988 memorandum clearly reveals that the decision to delineate the Ranch property originated with the Corps of Engineers. Furthermore, the April 1988 memorandum reveals that the delineation process was mandated by the Clean Water Act, 33 U.S.C. § 1344, and its implementing regulations,[4] and was accelerated by the discovery of apparent violations of the Clean Water Act on the Ranch property by Southmark. Thus, even if Southmark agreed to permit a survey of the Ranch property, the evidence clearly shows that the Corps of Engineers undertook the delineation of the Ranch pursuant to the Corps' statutory obligations, and not pursuant to an agreement with the owners of the Ranch property. Therefore, the Court concludes that there was no implied-in-fact contract between the Corps of Engineers and Southmark.[5] Defendant's motion for summary judgment on the breach of contract claim is therefore granted.

## CONCLUSION

For the foregoing reasons, defendant's cross-motion for summary judgment is granted-in-part and denied-in-part. The Court concludes that plaintiffs did not possess a legally-cognizable property interest in the Residential property at the time of the alleged taking. Therefore defendant's cross-motion for summary judgment is granted with respect to plaintiffs' claim of a taking of the Residential property. However, the Court finds that there are genuine issues of material fact with respect to plaintiffs' remaining claim that the government has temporarily and permanently taken plaintiffs' Commercial property for public use. Therefore, defendant's cross-motion for summary judgment is denied with respect to plaintiffs' claim of a taking of the Commercial property. Finally, the Court concludes that there was no implied-in-fact contract between plaintiffs and the government. Therefore, the government's cross-motion for summary judgment is granted with respect to plaintiffs' breach of contract claim. Plaintiffs' motion for summary judgment on the issue of liability is denied.

---

**4.** *See* 33 U.S.C. § 1344 (granting Corps of Engineers authority to regulate wetlands and other waters of the United States, and authority to issue permits allowing discharge of fill materials into waters within the Corps' jurisdiction); 33 C.F.R. § 325.9 (granting Corps of Engineers, acting through district engineers, authority to determine the extent of jurisdictional waters); *see also* 33 C.F.R. § 328.3 (defining jurisdictional waters); 33 C.F.R. § 328.4 (defining limits of Corps jurisdiction over particular waters of the United States).

**5.** Even if the Corps did enter into an agreement to delineate the Ranch, the Ranch was owned by Southmark, and not by plaintiffs, at the time of the purported agreement. Because plaintiffs could not have been a party to this alleged agreement, plaintiffs cannot assert a breach of this alleged contract. *See United States v. Johnson Controls*, 713 F.2d 1541, 1550 (Fed.Cir.1983) (rejecting breach of contract claim by subcontractor which was not in privity of contract with the government). Furthermore, despite plaintiffs' bald assertion that plaintiffs were third party beneficiaries of the "agreement" to delineate the Ranch, plaintiffs have failed to offer any evidence that the delineation was intended to benefit plaintiffs. *See Schuerman v. United States*, 30 Fed. Cl. 420, 433 (1994) ("The proper test for determining third-party beneficiary status is whether the contract reflects the express or implied intention of the parties to benefit the third party."). Absent any evidence of that plaintiffs were a third-party beneficiary of the alleged contract, plaintiffs cannot assert a breach of contract claim in this court. *See Maniere v. United States*, 31 Fed. Cl. 410, 416 (1994) ("[A]bsent a showing of either privity of contract or demonstration of an exception to the privity requirement [such as third-party beneficiary status], no jurisdiction exists to pursue a contract claim in this Court.").