Dolores WALCEK, et al., Plaintiffs,

v.

The UNITED STATES, Defendant.

No. 94–315L.

United States Court of Federal Claims.

Aug. 11, 1999.

Stanley J. Walcek, Bethany Beach, Delaware, attorney of record for plaintiffs.

Thomas L. Halkowski, Washington, D.C., Department of Justice, attorney of record for defendant. Barry Gale, U.S. Army Corps of Engineers, of counsel.

## OPINION

ALLEGRA, Judge.

This regulatory taking case, in which plaintiffs seek compensation stemming from the application of Federal wetlands regulations to their property, is currently before the court on defendant's motion for summary judgment and plaintiffs' motion for partial summary judgment. After careful consideration of the briefs filed by the parties, as well as the supplemental memoranda thereto, the oral argument, and for the reasons discussed below, the court GRANTS, in part, defendant's motion for summary judgment and DENIES plaintiffs' partial motion for summary judgment.

## I. Facts

In 1971, shortly before the enactment of the Clean Water Act, plaintiffs purchased 14.5 acres of land in Bethany Beach, Delaware (the property), with the intent of developing it into residential property. In 1984 the Army Corps of Engineers (the Corps) notified plaintiffs that the property includes 13.2 acres of federally regulated wetlands, approximately four to five acres of which is also state tidal wetlands. Notwithstanding, plaintiffs began filling and developing the property without the required federal and state permits. The Corps issued a cease and desist order in May 1986 to discontinue filling and clearing activities on the land, which activities violated the Clean Water Act, 33 U.S.C. §§ 1251, *et seq.* (1982). In 1988, plaintiffs submitted to the Corps an application under section 404 of the Clean Water Act, 33 U.S.C. § 1344 (1988), for authorization to fill and develop the land. The Corps rejected the application as incomplete. Plaintiffs submitted a new permit application in 1992 for a 77–lot "border to border" development, which the Corps began to process.

In order to develop the wetlands, plaintiffs also needed to acquire a Coastal Zone Management Consistency Certification and a Section 401 Water Quality Certification from the state of Delaware. On June 25, 1993, plaintiffs notified the Delaware Department of Natural Resources and Environmental Control (DNREC) that their development plans could not conform to the Delaware Coastal Management Plan regulations regarding the destruction of wetlands. On July 23, 1993, DNREC notified plaintiffs that their development project, as planned, was inconsistent with DNREC policies and, therefore, a Coastal Zone Management Consistency Certification could not be issued. In the letter, the DNREC suggested that alternative plans were available for development of the property, including a "scaled down" development proposal.

On December 20, 1993, after receiving notice of DNREC's denial of the required consistency certificate, the Corps notified plaintiffs that their section 404 permit application was being denied without prejudice, pursuant to 33 C.F.R. §§ 320.4(j) and 325.2(b).[1] On

---

1. During the year in question, 33 C.F.R. § 320.4(j) provided, in pertinent part, that

"where the required Federal, state and/or local authorization and/or certification has been de-

January 6, 1994, the DNREC notified plaintiffs that their Section 401 Water Quality Certification application had been inactivated because of the Corps' denial of their federal application. On May 13, 1994, plaintiffs filed this lawsuit, alleging that defendant's December 20, 1993, denial of a section 404 permit constituted a taking of plaintiffs' property.

In 1996, the Corps and plaintiffs corresponded regarding the possibility of submitting a less-extensive development project for permit consideration. On April 15, 1996, plaintiffs submitted an "Alternatives Analysis of the Walcek Property Proposed Development Plans" to the Corps, which proposed a number of different options for developing the property, including less-extensive developments than that proposed in the 1992 application. In response, the Corps provided plaintiffs with three development proposals "[i]n an effort to provide you with more specific guidance concerning what would have a better chance of being permitted." On August 30 and September 26, 1996, the Corps informed plaintiffs that they must "demonstrate why the [three] proposals currently under consideration would not be practicable" before the Corps would consider alternative development proposals from plaintiffs. The Corps further stated that it would issue a decision shortly, after which plaintiffs would be responsible for applying for State Water Quality and Coastal Zone Consistency Certifications. Plaintiffs responded on September 13 and October 19, 1996, with reasons why they believed the three proposed plans were unfeasible. Notwithstanding, on November 4, 1996, the Corps issued a permit decision authorizing a 28–lot residential development, which was one of the three plans proposed by the Corps.[2]

## II. Discussion

The Takings Clause of the Fifth Amendment provides: "[N]or shall private property be taken for public use, without just compensation." As recently explained by the Supreme Court, "[t]he aim of the Clause is to prevent the government 'from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.'" *Eastern Enterprises v. Apfel*, 524 U.S. 498, 118 S.Ct. 2131, 2146, 141 L.Ed.2d 451 (1998) (quoting *Armstrong v. United States*, 364 U.S. 40, 49, 80 S.Ct. 1563, 4 L.Ed.2d 1554 (1960)).

Long ago, Justice Holmes opined that, "while property may be regulated to a certain extent, if regulation goes too far, it will be recognized as a taking." *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 415, 43 S.Ct. 158, 67 L.Ed. 322 (1922). This oft-quoted language is the genesis of the so-called regulatory takings doctrine. The courts have recognized at least two categories of regulatory takings—permanent takings and temporary takings. *See, e.g., Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1015–16, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992) (permanent taking); *First English Evangelical Lutheran Church v. County of Los Angeles*, 482 U.S. 304, 318, 107 S.Ct. 2378, 96 L.Ed.2d 250 (1987) (temporary taking). Both forms of takings require compensation to be paid under the Fifth Amendment. *Dolan v. City of Tigard*, 512 U.S. 374, 384, 114 S.Ct. 2309, 129 L.Ed.2d 304 (1994); *First English*, 482 U.S. at 315–16, 107 S.Ct. 2378.

Plaintiffs in this case seek compensation for both a permanent and temporary taking of their property. They argue that the Corps' 1996 permit, which allows only partial development of the property, was a final determination of their broader permit request.[3] Plaintiffs contend that, restricted by

---

nied for activities which also require a Department of the Army permit before final action has been taken on the Army permit application, the district engineer will, after considering the likelihood of subsequent approval of the other authorization and/or certification and the time and effort remaining to complete processing the Army permit application, either immediately deny the Army permit without prejudice or con-

tinue processing the application to a conclusion." 33 C.F.R. § 320.4(j) (1993).

2. The facts recited in this segment appear without substantial controversy and shall be deemed established for purposes of future proceedings in this case. See RCFC 56(e).

3. This court has applied the ripeness doctrine enunciated in cases such as *Williamson County*

the Corps' permit, the value of their property has been so diminished as to effectuate a permanent taking. Alternatively, they argue that the Corps effectuated a temporary taking of their property by precluding development of their property for more than nine years, while the Corps considered whether to issue a permit.

Defendant has filed a motion for summary judgment, arguing that, as a matter of law, neither a permanent nor a temporary taking has occurred in this case. Summary judgment is appropriate when there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. RCFC 56; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). While arguing that genuine issues of fact exist here, plaintiffs have also filed documents in the nature of a partial motion for summary judgment.[4]

Disputes over facts that are not outcome-determinative under the governing law will not preclude the entry of summary judgment. *Liberty Lobby*, 477 U.S. at 248, 106 S.Ct. 2505. However, summary judgment will not be granted if "the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable [trier of fact] could return a verdict for the nonmoving party." *Id. See also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *People of the State of California v. United States*, 27 Fed.Cl. 130 (1992), *aff'd*, 11 F.3d 1071, 1993 WL 410284 (Fed.Cir.1993). When

reaching a summary judgment determination, a judge's function is not to weigh the evidence, but to determine whether there is a genuine issue for trial. *Liberty Lobby*, 477 U.S. at 249, 106 S.Ct. 2505. *See also Agosto v. INS*, 436 U.S. 748, 756, 98 S.Ct. 2081, 56 L.Ed.2d 677 (1978) ("[A] [trial] court generally cannot grant summary judgment based on its assessment of the credibility of the evidence presented."). The judge must determine whether the evidence presents a disagreement sufficient to require submission to fact finding, or whether it is so one-sided that one party must prevail as a matter of law. *Liberty Lobby*, 477 U.S. at 250–52, 106 S.Ct. 2505. In doing this, all facts, as well as all inferences drawn from the evidence, must be construed in a light most favorable to the nonmoving party. *Matsushita*, 475 U.S. at 587, 106 S.Ct. 1348.

### 1. Permanent Taking Claim

■ A property owner may show that the government has effectuated a "categorical taking" by demonstrating that a regulation has denied the property owner of "all economically beneficial or productive use of land." *Lucas*, 505 U.S. at 1015, 112 S.Ct. 2886. Even if a property owner is unable to demonstrate a categorical taking, the property owner may be able to prove that the government affected a compensable "partial taking." *Florida Rock Indus. Inc. v. United States*, 18 F.3d 1560, 1570 (Fed.Cir.1994), *cert. denied*, 513 U.S. 1109, 115 S.Ct. 898, 130

---

*Reg'l Planning Comm'n v. Hamilton Bank*, 473 U.S. 172, 105 S.Ct. 3108, 87 L.Ed.2d 126 (1985), to federal takings claims. As explained in *Cristina Inv. Corp. v. United States*, 40 Fed.Cl. 571, 574, *appeal dismissed*, 155 F.3d 570, 1998 WL 382669 (Fed.Cir.1998), "[t]hat doctrine provides that a governmental denial will be considered final, and any federal takings claim arising from that denial will therefore accrue, if the property owner made a proper application which the government denied both on the merits and in such a manner as to reveal that reapplication for a modified plan would be futile." Under this standard, while the Corps' 1993 decision denying plaintiffs' permit request "without prejudice" would not appear to be reviewable, the 1996 decision by the Corp to issue a limited permit clearly is a final reviewable determination. Defendant's counsel conceded the latter point at oral argument, noting, in addition, that the 1996

permit is the broadest permit that the Corps is prepared to issue.

4. On December 4, 1997, plaintiffs filed a "Motion for Alternative Relief," which includes a partial motion for summary judgment. On April 13, 1998, plaintiffs filed a "Petition for Declaratory Relief," which includes a request that the court issue a declaratory judgment as to whether "a taking had occurred at any time prior to suit filing." While plaintiffs did not seek to amend their complaint to include a request for declaratory relief, it remains that this court lacks jurisdiction to grant such equitable relief. *See Eastern Enterprises*, 524 U.S. at ——, 118 S.Ct. at 2145. ("[E]quitable relief is arguably not within the jurisdiction of the Court of Federal Claims under the Tucker Act."). *See also Overall Roofing and Constr., Inc. v. United States*, 929 F.2d 687 (Fed.Cir.1991).

L.Ed.2d 783 (1995). In such cases, the court must conduct "ad hoc, factual inquiries" into the circumstances to determine whether there is a taking. *Kaiser Aetna v. United States,* 444 U.S. 164, 175, 100 S.Ct. 383, 62 L.Ed.2d 332 (1979). *See also Connolly v. Pension Benefit Guar. Corp.,* 475 U.S. 211, 225, 106 S.Ct. 1018, 89 L.Ed.2d 166 (1986) (definition of a taking not controlled by "any set formula," but is dependent on "ad hoc, factual inquiries into the circumstances of each particular case") In 1978, the Supreme Court attempted to add structure to this inquiry, identifying three factors that are significant in determining whether governmental action constitutes a taking: (1) "[t]he economic impact of the regulation on the claimant;" (2) "the extent to which the regulation has interfered with distinct investment-backed expectations;" and (3) "the character of the governmental action." *Penn Central Transp. Co. v. New York City,* 438 U.S. 104, 124, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978). *See also Florida Rock,* 18 F.3d at 1564.

■ In assessing the first factor relevant to whether a regulatory taking has occurred, the economic impact of the regulation, the focus is on the relationship between the value of the property interest that was allegedly taken and the value of the property owner's interest in the "parcel as a whole." *Penn Central,* 438 U.S. at 130–31, 98 S.Ct. 2646; *see also Keystone Bituminous Coal Ass'n v. DeBenedictis,* 480 U.S. 470, 497, 107 S.Ct. 1232, 94 L.Ed.2d 472 (1987). This comparison measures the change in the fair market value of the property caused by the regulatory imposition. *Florida Rock,* 18 F.3d at 1567. In addition, in assessing the severity of the economic impact of the regulations, "the owner's opportunity to recoup its investment or better, subject to the regulation, cannot be ignored," thereby requiring the court to compare "the relationship of the

owner's basis or investment" in the property before the alleged taking to the fair market value of the property after the alleged taking. *Florida Rock Indus., Inc. v. United States,* 791 F.2d 893, 905 (Fed.Cir.1986), *cert. denied,* 479 U.S. 1053, 107 S.Ct. 926, 93 L.Ed.2d 978 (1987).

■ In this case, there are genuine issues of material fact concerning the value of the property allegedly taken, as well as the value of the property remaining, that preclude the court from granting summary judgment for either party. For example, defendant disputes plaintiffs' contention that they have been deprived of all economically viable use of their property, contesting, particularly, plaintiffs' claim that the parcel of property for which the Corps provided a permit does not represent an economically viable development. Moreover, the valuations assigned by the various parties to the "parcel as a whole"—the figure used in the denominator of the equation described in *Penn Central*— vary dramatically, almost by an order of magnitude. While defendant argues that there are "obvious" deficiencies in plaintiffs' valuation, in the court's view, those alleged deficiencies are somewhat murkier and do not obviate the necessity for a fuller factual inquiry and, especially, a thorough explanation of the valuation methodologies employed by each party. Only then will this court be able to compare adequately the value of the property allegedly taken with the value of the parcel as whole, as required by *Penn Central.*[5]

■ Further, there appear to be genuine issues of material fact regarding the extent to which the Corps' action has interfered with the plaintiffs' "distinct investment-backed expectations." This second factor of the *Penn Central* analysis encompasses two elements: first, the extent of the plaintiffs'

5. Factual questions also exist as to the plaintiffs' basis or investment in the property for purposes of determining whether plaintiffs would make a profit on the property were it developed consistent with the 1996 permit. For purposes of this calculation, the plaintiffs' basis or investment is not necessarily limited to the purchase price of the property and may include other capital expenditures that would add to the original cost

basis of the property. *See, e.g., Florida Rock Indus., Inc. v. United States,* 21 Cl.Ct. 161, 176 (1990) (suggesting that other costs beyond purchase price enter into the calculation of the property owner's basis or investment in the property), *vacated on other grounds,* 18 F.3d 1560, 1570 (Fed.Cir.1994), *cert. denied,* 513 U.S. 1109, 115 S.Ct. 898, 130 L.Ed.2d 783 (1995).

investment in reliance on the regulatory scheme in place at the time of the purchase; and second, the extent to which the regulation of their property was foreseeable. *See, e.g., Ruckelshaus v. Monsanto Co.,* 467 U.S. 986, 1006, 1013, 104 S.Ct. 2862, 81 L.Ed.2d 815 (1984). Here, plaintiffs purchased the property before the passage not only of the state regulatory scheme, but also the Clean Water Act itself. *See* Federal Water Pollution Control Act, P.L. 92–500, 86 Stat. 816 (1972); Delaware Wetlands Act, Del.Code Ann. Tit. 7, §§ 6601, *et seq.* (1973). Plaintiffs argue that they invested in the property with the expectation that they would be permitted to develop fully the property. Whether that expectation was reasonable and whether the subsequently enacted regulatory schemes were foreseeable are again questions of fact requiring further elucidation at trial.

Accordingly, material and genuine questions of fact exist here as to at least two prongs of the *Penn Central* test. Therefore, neither party is entitled to summary judgment on the issue whether plaintiffs suffered a permanent taking of their property.

### 2. Temporary Taking Claim

█ In evaluating temporary takings claims, courts generally focus on two elements. First, they look to whether the government's actions have temporarily deprived the property owner of all or substantially all economically viable use of their property. *See, e.g., Anaheim Gardens v. United States,* 33 Fed.Cl. 24, 36 (1995) ("In order to prevail on a temporary taking claim, a plaintiff must show that substantially all economic use of its property was denied during the period in question."); *1902 Atlantic Ltd. v. United States,* 26 Cl.Ct. 575, 579 (1992) ("Just as in a permanent taking claim, plaintiff must show that substantially all economic use of its property was denied during the time in question."). Second, they look to whether the government is responsible for "extraordinary delay" in the regulatory process. *See, e.g., Tabb Lakes Inc. v. United States,* 26 Cl.Ct. 1334, 1352–54 (1992), *aff'd,* 10 F.3d 796 (Fed. Cir.1993); *Dufau v. United States,* 22 Cl.Ct. 156, 163 (1990), *aff'd,* 940 F.2d 677, 1991 WL 130314 (Fed.Cir.1991). *See also Norman v.*

*United States,* 38 Fed.Cl. 417, 427 (1997) (summarizing cases). As the Supreme Court has explained, "[m]ere fluctuations in value during the process of governmental decision-making, absent extraordinary delay, are 'incidents of ownership. They cannot be considered as a "taking" in the constitutional sense.'" *Agins v. City of Tiburon,* 447 U.S. 255, 263 n. 9, 100 S.Ct. 2138, 65 L.Ed.2d 106 (1980) (quoting *Danforth v. United States,* 308 U.S. 271, 285, 60 S.Ct. 231, 84 L.Ed. 240 (1939)).

█ Plaintiffs argue that a temporary taking occurred in this case. Although there is some question as to the exact contours of this allegation, plaintiffs appear to argue that from 1988, when they filed their initial section 404 permit request with the Corps, until 1996, when the Corps granted a permit for a portion of the property, the Corps deprived them of the economic use of that portion of their property for which the permit was eventually granted. However, the materials submitted by the parties with their motions do not support this contention.

Plaintiffs are correct that the Corps' 1986 cease and desist order effectively stopped their development of the property as they had planned. But, as this court has noted in previously holding that this order did not itself effectuate a taking, the order specifically left the door open to plaintiffs applying for and receiving a permit to fill in a portion of the wetlands. *See Walcek v. United States,* order dated November 30, 1995, docket No. 94–351L. That the order subjected plaintiffs to the wetlands permitting process did not effectuate a taking. As indicated by the Supreme Court, "[a] requirement that a person obtain a permit before engaging in a certain use of his or her property does not itself 'take' the property in any sense: after all, the very existence of a permit system implies that permission may be granted, leaving the landowner free to use the property as desired." *United States v. Riverside Bayview Homes, Inc.,* 474 U.S. 121, 126–27, 106 S.Ct. 455, 88 L.Ed.2d 419 (1985). *See also Tabb Lakes, Ltd.,* 10 F.3d at 800–01. Here, plaintiffs applied in 1988, and again in 1992, for permits to use the wetlands. But, the record indisputably indicates that in both

468

instances, the Corps failed to grant the application only because plaintiffs did not provide requisite information and state permits. As such, plaintiffs are incorrect in arguing that the Corps temporarily deprived them of the economic use of the property, when the undisputed facts indicate that any such deprivation was due to plaintiffs' own failure to complete the permitting process, as well as their strategic decision to initiate this lawsuit, rather than pursuing the permitting process to a final merits determination.

For similar reasons, there was no "extraordinary delay here." In particular, there is no dispute that plaintiffs submitted an incomplete application to the Corps in 1988. Instead of completing this application by providing the information that had been requested by the Corps, plaintiffs chose to pursue a declaratory judgment action, that ultimately was dismissed by the district court. In 1992, plaintiffs requested the Corps to reactivate their application and then, in late 1992, after their declaratory action had been dismissed, plaintiffs chose to submit an entirely new application. On December 20, 1993, plaintiffs' application was denied without prejudice, on the basis of their failure to obtain the requisite state permit, and plaintiffs were informed by the state that it would consider a scaled down proposal. Plaintiffs, however, chose to pursue the instant litigation and did not actively pursue a lesser alternative until February of 1996. In November of 1996, the Corps then issued the permit to develop a 28–lot segment of the property.

Based on the foregoing events, it appears that plaintiffs' failure to provide the requisite information and its strategic decision to pursue litigation rather than administrative alternatives were responsible for all but approximately one year of the delay between the filing of plaintiffs' original 1988 petition and the granting, in 1996, of the limited permit. Such a delay is not the sort of "extraordinary delay" that gives rise to a temporary taking. *See Anaheim Gardens*, 33 Fed.Cl. at 37 (holding delay in granting a permit was not "extraordinary" because government's rulemaking machinery was operating during the period in question); *Dufau*, 22

Cl.Ct. at 163–64 (holding a sixteen-month delay in granting a permit was not "extraordinary" because the Corps had been actively pursuing the matter). This is particularly true as there is no evidence in the record that the Corps acted negligently or in bad faith in processing plaintiffs' petitions. Accordingly, regarding plaintiffs' temporary taking claim, the court holds that there are no genuine disputes as to material fact and that defendant is entitled to judgment as a matter of law.

## III. CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment is GRANTED, in part, and plaintiffs' motion for partial summary judgment is DENIED. Trial will be set on the issue whether a permanent taking occurred in this case. The court, by separate order, will resolve plaintiffs' pending motion to bifurcate trial here and will establish deadlines and procedures for further proceedings in this case.

